**LACK INDUSTRIES, INCORPORATED,** a corporation, Ernest E. Lack, individually and doing business as Lack Game Farm, and Adele G. Lack, Appellants,

v.

**RALSTON PURINA COMPANY,** a corporation, Appellee.

**No. 17219.**

United States Court of Appeals Eighth Circuit.

Feb. 4, 1964.

Stuart W. Rider, Jr., Minneapolis, Minn., made argument for the appellant and filed brief with counsel, Rider, Bennett, Egan & Johnson, Minneapolis, Minn.

Harold C. Evarts, Minneapolis, Minn., made argument for the appellee and filed brief with counsel, Best, Flanagan, Lewis, Simonet & Bellows, Minneapolis, Minn.

Before VOGEL, MATTHES and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

This case has been twice tried to a jury. The court below granted a motion for new trial after the first trial and ordered the judgment entered therein vacated and set aside, 199 F.Supp. 874.

Defendants-appellants (hereafter referred to as "appellants") seek review of the second jury verdict from the United States District Court, District of Minnesota, awarding plaintiff-appellee (hereafter referred to as "appellee") a judgment in the amount of $48,966.62 in an action on certain contracts of indebtedness. Jurisdiction was based on diversity of citizenship.

Appellee, Ralston Purina Company, is a Missouri corporation, while appellants, Lack Industries, Incorporated, Ernest E. Lack, an individual, and doing business as Lack Game Farm, and Adele G. Lack, an individual, reside or was incorporated in the State of Minnesota.

Appellee's original cause of action comprised an unpaid chattel mortgage note dated August 1, 1958 for $56,000.00 executed by the corporate defendant; an unpaid chattel mortgage note dated February 2, 1959 for $50,000.00 executed by the corporate defendant; unpaid trade acceptances totalling $34,044.06 due from the corporate defendant and Ernest E. Lack; and an open account totalling $5.21; on all of which interest of six per cent is claimed owing. The entire indebtedness was secured by a guaranty dated February 6, 1959 pledging Ernest and Adele Lack's joint and several liability.

Acknowledging execution of the above contracts on which appellee's action is bottomed, appellants in both trials asserted the contracts of indebtedness were void, pleading fraud in their inducement as a defense. Appellants interposed a counterclaim based on the same alleged acts of fraud. The facts culminating in this appeal as established in the second trial may be recounted as follows.

Ernest E. Lack in and prior to 1957 was in the food brokerage business in the Minneapolis, Minnesota area. In 1956 Lack had acquired some land in Bethel, Minnesota, upon which he erected a chicken brooder house for the purpose of raising poultry on a limited scale. In 1957 Lack constructed a poultry processing plant which prepared his grown broilers and others for market. At this time, Lack's plant had a processing capacity of twenty-five hundred birds per day.

With a desire to pioneer a large scale broiler industry in the State of Minnesota, Lack, in early 1958, investigated the feasibility of an extensive expansion of his operation.

He determined that there were five million persons in the prospective trade territory with a sizable per capita consumption of poultry which necessitated the importation of ninety-five per cent of the product from other parts of the country. Lack conceived a plan to expand

his operations in steps to an ultimate production of seven million birds per annum. His plan called for an initial increase in production to one million birds the first year. To accomplish this phase of his expansion program, he sought financial assistance. Lack compiled a brochure which he entitled "Lack Game Farm Marketing Program". Prior to contacting Ralston Purina, he made a presentation of his program to three different feed companies. While these companies expressed some interest in his program, they declined help as it necessitated financial assistance.

Thereafter he discussed his plan with a district salesman of Ralston Purina, Gus Cadwallader. Lack's original brochure from which he made his presentation set forth the number of birds he then had on feed and under contract and also those available from one Mr. Tinklenberg, a processor who had contracts with growers but due to his own plant's closure had been utilizing Lack's plant. Tinklenberg was subsequently employed by Lack. Lack's discussion of his plans with Cadwallader led to the conclusion that additional growers should be contacted and those agreeable to participating in Lack's plan be added to the brochure's list of growers. The resultant additional list of growers represented the brochure's only change when subsequently presented to Ralston Purina.

Lack and Ralston Purina officials met in St. Louis on April 1, 1958. He sought an advance of $100,000.00, interest free, and guidance on the expansion and operation of his plant. Ralston Purina advised Lack that it was not in the banking business and suggested that he needed equity money or a bank loan. They pointed out the possibility of a Small Business Administration loan processed through a bank and advised him to attempt to procure such a loan with their assistance. Lack then contacted the North American Office of the Northwestern National Bank in Minneapolis, Minnesota in an effort to negotiate a loan. He requested Ralston Purina to furnish the bank with operating statements from some of its other dealers. In compliance with this request, Ralston Purina on April 30, 1958, addressed a letter to the North American Office of the Northwestern National Bank, outlining Lack's equipment needs and enclosing statements of two other Ralston Purina dealers whose identities were undisclosed. These statements came to be known as "Dealer A and Dealer B statements".

In the interim, so that Lack could place an order for the original equipment, Ralston Purina extended him credit by way of seventy-five day trade acceptances in the amount of $32,000.00 and also agreed to make a capital loan to him up to a maximum amount of $30,000.00.

The Dealer A statement furnished the bank by Ralston Purina showed a net income before taxes for the fiscal year ending June 30, 1957 in the amount of $11,-471.15 and for the succeeding six months net income before taxes of $21,962.66. Ralston Purina's accompanying letter to the bank stated that the enclosed Dealer A operating statement reflected two times as much profit in the six month period statement as compared with the previous twelve month statement, resulting from a substantial increase in volume and in installation of Gordon Johnson equipment by Dealer A. Ralston Purina had also recommended to Lack that he install equipment manufactured by the Gordon Johnson Company, the largest manufacturer of poultry processing equipment. Appellants made an offer to prove that Dealer A's final profit for the fiscal year ending in June, 1958 was actually only $9,916.21. This offer of evidence was rejected by the trial court.

Lack's accountant prepared for the Northwestern National Bank an unaudited, cash flow projection for Lack's operation based on Dealer A's six-months' profit of some $21,962.66. While this projection (copies of which were received by appellee and appellants shortly after July 11, 1958) indicated on the surface the profitability of Lack's operation, Lack's accountant admitted its unreliability in the absence of a certified audit. A fact which he testified he con-

veyed to the bank, as well as to Lack, at the time of its preparation.

Appellants offered to prove that at the time Ralston Purina received a copy of the projection, it knew that Dealer A's actual annual profit had been only $9,-916.21. The court also ruled this evidence was inadmissible.

Appellants ultimately negotiated a conventional $70,000.00 loan from the main office of the Northwestern National Bank to purchase the recommended equipment to implement its expansion program inaugurated in May of 1958.

While in St. Louis at the original meeting, Lack, in addition to financing, also requested from Ralston Purina information on growers' contracts used in other market areas. A summary of such contracts was furnished Lack by Ralston Purina. Some of the contracts provided for reduced payments for inferior birds, others provided for a fluctuating price based on the market in Georgia or another area, and some contained variations of both these provisions.

Before Lack embarked on the processing phase of the business, he had a contract with Armour & Company priced on the basis of the Northwest Arkansas market quotations. His brochure indicated that at the time he made the presentation to Ralston Purina in St. Louis, his contract with his growers was a fluctuating one based on the North Georgia market. While the brochure reported the existence of such a contract, it was proven that Lack had only an oral contract with his growers with which they were dissatisfied. They did not want a contract based on the risk of a declining market and, therefore, requested a contract with a fixed guarantee.

Recognizing the necessity of having a contract attractive to the growers in order to have the necessary chickens for capacity processing, Lack discussed this problem with employee Tinklenberg, Mr. Elkinson, proprietor of the Jack Frost Company where Lack had always purchased his baby chicks, and Ralston Pu-

rina representative Cadwallader. The concensus of opinion was that the best contract to attract the necessary growers would be one with a fixed price (based on the pounds of feed consumed compared to the pounds of live weight obtained) without a provision for reduced payment for inferior birds. Lack, upon approval of his attorney, adopted such a contract.

Approximately nine months after the expansion program was first begun, Lack in January of 1959 instituted a "crash program" to expand the number of birds on feed in his operation from eight-five thousand to two hundred eighty-seven thousand by May of 1959. This was done to fully utilize his expanded plant facilities. This increase comported with Lack's original program as outlined to Ralston Purina. However, Lack contended it was done solely on advice of Ralston Purina. Ralston Purina loaned the Lack corporation $50,000.00 for the proposed expansion after obtaining the personal guaranty of Lack's wife, Adele, known to own sizable stock interests. Mrs. Lack stated that prior to execution of the guaranty she conferred only with her husband and their accountant. She asserted that in executing the guaranty, she relied solely on her accountant's projection of the profitability of the Lack company's operation, in turn, based on his analysis of the Dealer A statement. Ralston Purina had furnished this Dealer A statement in its letter to the bank dated April 30, 1958 and it was not until February 6, 1959 that Mrs. Lack executed the guaranty. At the time she executed the guaranty, the available operating statement of the Lack company showed a current loss in excess of $11,000.00.

Throughout the "crash program", both Ralston Purina and Lack were concerned about the labor prices the Lack corporation paid to growers pursuant to their contracts. The rates exceeded those paid in other broiler production areas of the country, though not in excess of the Minnesota market. Also, Ralston Purina was concerned about the price Lack was paying for his baby chicks, however, unaware that Lack's source, the Frost Com-

pany, had reduced Lack's price from 13¢ to 12¢ and assumed one-third of any market decrease in the Georgia area. Also, during this period, unbeknown to appellants, inter-company correspondence and memoranda were circulated among officials of Ralston Purina involved with the Lack account re-emphasizing the need for Ralston Purina's close supervision of the expansion program in order to insure the success of the operation against financial disaster.

After Ralston Purina had made Lack a dealer, it offered him its business management service, which availed growers information on good breeding, management, sanitation and feeding. Ralston Purina's policy also was to furnish its dealers financial management service. This consisted of analyzing financial reports which the dealers were to furnish from their accountants so that ratio studies could be computed on sales and expenses. Lack did not furnish the necessary information to Ralston Purina to provide such a service. Lack's own accountant testified that during the rapid expansion program it would have been impossible to make a meaningful cost study. Furthermore, when the first year-end audit was taken, it was discovered that the monthly statements prepared by Lack's bookkeeper under the supervision of Lack's auditor were completely erroneous.

In February of 1959, the bookkeeper for the Lack company had informed Ralston Purina that she was having trouble paying the growers on time. They suggested she use a card index system which would facilitate the growers' payments.[1] Her problem stemmed from the fact that employee Tinklenberg was dilatory in forwarding her copies of the growers' receipted feed tickets. The bookkeeper failed to debit the feed inventory account with the amounts consumed by its growers resulting in an unrealistic feed inventory account. This error was not un-

covered until the year-end audit. Lack's books erroneously showed a small profit for the eleven months ending June 30, 1959. The year-end audit as of July 31, 1959, however, revealed a deficit in the sum of $107,424.21. When this discovery was learned, Lack's accountant recommended he cease business, and Ralston Purina, which had been receiving dishonored checks from Lack by this time, stopped all feed sales to the Lack company. Lack discontinued operations on September 25, 1959. When suit was filed, appellants had purchased $232,356.00 of feed from appellee and paid for all except $34,044.00 worth.

Appellants submit that the contracts sued on are vitiated as a result of their inducement by appellee's fraud. The alleged fraudulent acts in main pleaded by appellants in their defense and counterclaim are appellee's:

1. Submitting to the lending bank an inaccurate financial statement of one of its dealers possessing knowledge of its falsity.

2. Permitting appellants' accountant to prepare an unrealistic projection of appellants' future profits based on this known erroneous financial statement.

3. Recommending a "crash" expansion program while concealing from appellants known pitfalls of the plant's achievement, i. e., high costs of operation and fear of bankruptcy from over-expansion.

4. Advising appellants' bookkeeper to maintain a filing system which produced bookkeeping errors undetected through appellee's promised but unfulfilled "Business Management Service".

The first trial commenced May 4, 1961. The issues of fraud as a defense in appellee's action and fraud as the basis for appellants' counterclaim were tried. The jury on May 12, 1961 returned a Special Verdict finding Ralston Purina guilty of misrepresentation of material facts in-

---

1. Lack's own accountant had originally installed the company's bookkeeping system and the bookkeeper consulted with his firm on matters pertinent thereto.

The auditors from the accountant's firm would prepare, every month or so, a financial statement from Lack's books.

ducing the signing of all contracts sued upon. Judgment was entered accordingly on May 17, 1961.

On May 19, 1961, appellee made Alternative Motion for Judgment Notwithstanding the Special Verdict or New Trial, the Alternative Motion for New Trial made on the grounds, *inter alia,* that the Special Verdict was "contrary to the law" and "contrary to the evidence". On January 4, 1962, over seven months after judgment was entered, the District Court entered its Order Denying Motion for Judgment N.O.V. and granting the Motion for New Trial, stating in part "because the verdict is contrary to the clear weight of the evidence, and to permit it to stand would constitute a miscarriage of justice".

During the second trial, the defense of fraud to appellee's action was tried but not submitted by the court to the jury. The Court's instructions provided that there was no evidence to support any charge of fraud against the appellee, and that the amount owed appellee by appellants as evidenced by the obligations incurred was $156,390.83 with interest to the date of the verdict. Appellants' Amended Counterclaim likewise based on fraudulent misrepresentations was tried but only two issues of "negligent misrepresentations" in support thereof were submitted to the jury. The court's instructions were that the jury in determining whether or not there was negligence on the part of appellee in discharging the duty it assumed to advise appellants could consider appellee's representations with respect to the recommended growers' contract and "crash program". Additionally, the court charged that any amount the jury found for the appellants on their counterclaim must be set off against the alleged indebtedness the court had directed that the appellants owed appellee. The second trial concluded in a verdict in favor of appellee for $48,966.62.

On appeal, appellants submit that the District Court did not have jurisdiction to grant the new trial on January 4, 1962, seven months after the entry of judgment, in view of Rule 59(d), Fed. R.Civ.P., providing that a trial judge may grant a new trial on his own initiative only within ten days from the date of judgment. In support of its position that the new trial was ordered *sua sponte* by the trial judge and not in response to appellee's motion, appellants make the following arguments:

1. Appellee's motion stated that the verdicts were "contrary to the evidence" while the court's order provided that the new trial was granted because the verdict is "contrary to the *clear weight* of the evidence". Thus, it was given on grounds not contained in appellee's motion.

2. The use in the order of the phrase "miscarriage of justice" was not contained in appellee's motion and unresponsive thereto.

3. The fact that the court stated the grounds for its order, since the court is required only to give the grounds when granting the new trial *sua sponte*, but not required to do so if granted on motion of a party.

While contending that the evidence as a whole was sufficient to present a jury question on the issues of fraud, appellants also argue that their defense the contracts of indebtedness were induced by fraud and are void, is established as a matter of law. Appellants rely on the fact that the court actually directed a verdict for appellee for $156,390.83 plus interest but permitted the jury to also consider whether appellee was "negligent". This resulted in verdict for appellee for only $48,966.62, which appellants assert signifies the jury found appellee guilty of "negligent misrepresentation", a form of fraud under Minnesota jurisprudence.

Finally, appellants contend they are entitled to a new trial because the court erred in removing from the jury's consideration of damages the question of appellants' out-of-pocket losses resulting from (1) the drop in market value of the plant building and processing equipment, caused by appellee's sudden discontinu-

ance of feed sales forcing a shutdown of appellants' operation, and (2) losses sustained by individual appellants' personal investments in the corporation during the corporation's contractual association with appellee.

## NEW TRIAL ORDER

Appellee's motion for a judgment n. o. v. or new trial, filed on May 19, 1961, contained general introductory grounds asserting the verdict was contrary to the evidence and law, while the remainder of the motion enumerated seventeen specific grounds in support thereof.

District Judge Edward J. Devitt's order denying a judgment n. o. v. but granting a new trial is accompanied by a memorandum stating the reasons for which the new trial was granted:

"\* \* \* (T)he motion for a new trial should be granted because the verdict is contrary to the clear weight of the evidence, and to permit it to stand would constitute a miscarriage of justice.

"\* \* \* (O)n the whole record the Court is satisfied that there is some evidence, more than a scintilla, to support the verdict, and hence the Court is without authority to grant judgment n. o. v.; also on the whole record the evidence in support of the verdict is not persuasive and is contrary to the clear weight of the evidence. To permit it to stand would be unjust."

▮ Firstly, appellants' assertion that the phrase "contrary to the evidence", as contained in the motion, is not equivalent to the order's words "contrary to the clear weight of the evidence" is grounded on the reasoning that had the court found the former to be true, it would have granted a judgment n. o. v. which it declined to do. Therefore, appellants argue the court's order was reached on different evidentiary findings not included in appellee's motion. Appellants cite no authority which distinguishes the two phrases' legal meanings. Citing Aetna Cas. & Surety Co. v. Yeatts, 122 F.2d 350 (4th Cir. 1941), Judge Devitt apparently relied on its language for his choice of words in his order. In the Aetna case, the trial judge was confronted with plaintiff's motion for judgment n. o. v. and alternate motion for new trial based on the ground that the verdict was "contrary to the credible evidence". The trial judge denied both motions, and the Court of Appeals for the Fourth Circuit commented generally on the propriety of granting a new trial under Rule 59:

> "(I)t is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Aetna Cas. & Surety Co. v. Yeatts, supra, 122 F. 2d at 352.

The rationale's testing the verdict against the "clear weight of the evidence" was not restricted by the Fourth Circuit to only those cases where the trial judge was considering the granting of a new trial on his own initiative under Rule 59(d). Nor does the court describe the phrase as a legal term of art imbued with any special meaning. In fact, this test was created in a case in which the trial judge's order denying the new trial was in direct reply to a party's motion alleging the verdict was "contrary to the credible evidence". Thus, a fortiori, the "clear weight of evidence" test may be applied in like manner in order to grant a party's motion for new trial urged on the basis the verdict is contrary to the evidence.

▮ By the same token, the Aetna case expunges appellants' second argument that the use of the phrase "miscarriage of justice" in the order when not included in the motion is indicia of the court's acting on its own initiative.

▮ And finally, appellants' contention that the trial judge's memorandum in support of the new trial order in and of itself denotes a grant under Rule 59

(d) because this subsection requires specification of grounds carries little, if any, persuasion in the absence of supporting authorities. There is no prohibition in the Federal Rules of Civil Procedure precluding the trial judge from writing a supporting memorandum when awarding a new trial under 59(a) in response to the moving party's motion. Furthermore, cases are too numerous for citation in which the trial judge spells out the grounds in granting a party's motion for new trial under 59(a). Consequently, appellants' point on this score is just not well taken.

Subsection (a) of Rule 59 clearly empowers the district court judge with authority to grant all or any of the parties to an action a new trial on all or part of the issues for any of the reasons recognized at common law or in equity in courts of the United States when the Federal Rules of Civil Procedure were adopted. Subsection (b) provides that for the party's motion to be timely, it must be served within ten days from the entry of judgment. In the event neither party files a motion for new trial within the prescribed time period or a motion is filed on grounds not subsequently adopted in the court's order, the trial judge may yet grant a new trial on his own initiative under 59(d), *provided* he does so not later than ten days from the entry of judgment.

Prescription does not run against the court's order which is issued in response to a party's motion for a new trial under 59(a). However, Freid v. McGrath, 76 U.S.App.D.C. 388, 133 F.2d 350 (1942) holds that 59(d) prevents the court from granting a new trial more than ten days after entry of judgment on a ground not assigned by the losing party in his motion for new trial. The Freid doctrine stands against the proposition that timely filing of the motion

for a new trial increases the time period beyond ten days from entry of the judgment within which the trial judge may grant a new trial for reasons not contained in the original motion.

This Court has ruled that the party's grounds in its motion for new trial must be "reasonably specific" to meet the requirement of particularity imposed by Rule 7(b), Fed.R.Civ.P. Tsai v. Rosenthal, 297 F.2d 614 (8th Cir. 1961). We also specified:

"Respectable authority exists for giving motions for new trial filed by the parties a *broad construction* for the purpose of determining whether the court acted upon a motion of the party or upon its own motion in considering the issue of jurisdiction for the court to act." (Emphasis supplied) Tsai v. Rosenthal, supra, 297 F.2d at 619.

While this dicta in the Tsai case sheds light on the case at bar, its result is factually distinguishable from the instant case.[2]

However, in Lebeck v. William A. Jarvis, Inc., 250 F.2d 285 (3rd Cir. 1957), a personal injury suit, the motion for new trial alleged that the verdicts were against the weight of evidence on the issues of negligence while the court's order issued over ten days from judgment entry granted a new trial on the basis that the verdict was contrary to the weight of evidence on an agency issue essential for defendant's liability. Affirming the validity of the trial court's order, Judge Hastie refused to extend the Freid doctrine, as he put it, to this situation in which "the motion complained that the verdict was against the weight of the evidence and a new trial was ordered on that *general ground*". Lebeck v. William A. Jarvis, Inc., 250 F.2d supra at 289–290. (Emphasis supplied)

2. In Tsai, unlike here, the trial court in its order specifically denied the allegations of the moving party's motion for new trial and granted the new trial for a redetermination of the question of damages as to the co-defendants—a ground not even alluded to by the movant in his motion. Since the order was issued ten days after entry of judgment, unequivocally on the court's own initiative, it was only proper to reverse the trial court under 59(d) in applying the teachings of Freid, supra.

Thus, it is readily discernible that the language of the motion and subsequent order need not be identical but only reasonably synonymic to be responsive. See also General Motors Corp. v. Perry, 303 F.2d 544 (7th Cir. 1962) and Cooper v. Midwest Feed Products Co., 271 F.2d 177 (8th Cir. 1959).

Not only in the case for decision did Judge Devitt's order and appellee's motion comport *generally* on the grounds of quantum of evidence supporting the verdict, but, for example, appellee specifically alleged in its motion in part that the evidence failed to establish as a matter of law the existence of a fiduciary relationship between appellee and appellants. What language of a more direct reply could Judge Devitt have chosen in his order stating, "I wasn't impressed that the evidence showed this fiduciary relationship or great obligation of Ralston to nurture him (Lack) along."?

█ The authorities demonstrate conclusively that appellants' motion for new trial was properly and timely granted by the trial judge within the purview of Rule 59(a).

## FRAUD

Appellants predicated their defense and counterclaim upon common issues of fraud which the trial judge negated in submitting only issues of negligent misrepresentation to the jury for its consideration of the counterclaim's allegations.

█ Since the instant case made its way into federal court via diversity of citizenship, an examination of the applicable law to the issues presented must be prefaced with recognition of the fact that the alleged fraudulently induced transactions were executed and performed in the State of Minnesota. Therefore, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) dictates that the substantive law of Minnesota is controlling.

A comprehensive review of the Minnesota authorities treating the subject of actionable fraud was painstakingly covered by Judge Blackmun of this Court in Hanson v. Ford Motor Co., 278 F.2d 586 (8th Cir. 1960), relied on by both appellee and appellants in their briefs. Reiterating his findings in that case, we quote from his opinion's summary that to make out a case of fraud:

"1. There must be a representation;

"2. That representation must be false;

"3. It must have to do with a past or present fact;

"4. That fact must be material;

"5. It must be susceptible of knowledge;

"6. The representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false;

"7. The representer must intend to have the other person induced to act, or justified in acting upon it;

"8. That person must be so induced to act or so justified in acting;

"9. That person's action must be in reliance upon the representation;

"10. That person must suffer damage;

"11. That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury." Hanson v. Ford Motor Co., supra, 278 F.2d at 591.

Appellants argue that all the contracts of indebtedness incurred from April, 1958 through February, 1959 were induced by appellee's fraudulent misrepresentations. As its main proof, appellants introduced in evidence the Dealer A financial statement furnished appellants and the lending institution by appellee on April 30, 1958. The admissible evidence pertaining to this exhibit established that the representations contained therein regarding the profits of the illustrated dealer were in fact true. The representation that the reflected increased profits were

attributable in part to the installation of certain new equipment was false, in that the dealer involved testified that at the time of the statement's reference, no substantial quantity of new equipment as the kind described had been installed.

■ While Hanson v. Ford Motor Co., supra, recognized the principle that misrepresentations of profits are material in supporting a fraud action of the party investing funds in reliance thereon, the facts of that case which permitted a plaintiff recovery in such a situation are inapposite to those in the case at bar. In Hanson, the figures representing profits relied upon by plaintiff to his detriment were false, whereas the corresponding accounting statements in the instant case were accurate. Consequently, as to the profit representations proven true, Rien v. Cooper, 211 Minn. 517, 1 N.W.2d 847, 851 (1942), provides us with the basic criterion that the representation must be false to show fraud:

> "It is axiomatic that fraud cannot be predicated on the truth. A true representation is not actionable."

■ Appellants charge the trial judge with reversible error in denying its offer of proof that, when appellants later executed the guaranty and inaugurated the "crash program", they were permitted to rely by appellee on their accountant's financial projection of their business based on the Dealer A statement which by this time was known, but not revealed by appellee, to be misleading. Assuming *arguendo* that this evidence is admissible, a case of fraud is not thereby established. Appellants' own accountant testified of his conveying to appellants, as well as the bank, the fact of the unaudited projection's unreliability. Certainly, under these circumstances, appellants were not justified in relying upon the projection under the criteria adopted in Hanson.

Moreover, months after preparation of the Dealer A, six-months statement, no one would know better than Lack's accountant of the Dealer A, year-end statement's availability. Ralston Purina was not guilty of any fraud in failing to forward appellants a statement of Dealer A's year-end profits in the absence of a request from appellants and absent evidence they had knowledge appellants at this time were relying on a non-current statement of one of its dealers. In addition, at this juncture, the Lack company had operated for several months and its books already reflected operating losses. These evident losses should have served as a red flag of warning to appellants against over-expansion. No valid projection of Lack's future, profit picture might still be justifiably relied upon by appellants based upon a pro forma, profit statement of a prior six months' operating period of another dealer. See Eurich v. Bartlett, 151 Minn. 86, 186 N.W. 138, 140 (1922).

■■ As previously stated, the Dealer A statement did contain appellee's erroneous reference to the installation of certain new equipment by the anonymous dealer. This representation's falsity per se will not, without other elements present, support appellants' claim of fraud in the inducement either as a defense to the contracts of indebtedness or as the basis of the fraud alleged in their counterclaim. Viewing the evidence in a light most favorable to appellants, it may be stated they justifiably relied on this misrepresentation in executing the ensuing contracts and by purchasing and using the brand of equipment recommended. However, the evidence fails to demonstrate any causal relationship between the damages appellants allegedly sustained and the acknowledged misrepresentation. In other words, appellants did not show that they suffered any damage attributable to the use of the particular equipment in question in reliance on appellee's misrepresentation, whether inspired by wrongful motive or honest error. It is hornbook law, as well as long standing Minnesota case law, that in a fraud action recovery is dependent upon proof that the damage incurred be proximately caused by the alleged fraudulent misrepresentation. Hanson v. Ford Motor Co., supra; Edward Thompson Co. v. Peterson, 190 Minn. 566, 252 N.W. 438

(1934) ; Walsh v. Paine, 123 Minn. 185, 143 N.W. 718 (1913).

In the Edward Thompson Co. v. Peterson case, an attorney was sued for default of payment by the vendor of certain lawbooks. The attorney contended unsuccessfully that his purchase was induced by misrepresentations of the vendor's agent when falsely told that two other leading local attorneys had acquired the same books. The Minnesota Supreme Court found:

"(T)he misrepresentation of the agent was immaterial and * * * the value of the books to defendant was not in any way affected by the fact that the two lawyers in question had not purchased similar books." Edward Thompson Co. v. Peterson, supra, 252 N.W. at 438.

This causation element is often stated in terms of the "materiality" of the fraud as pointed out in Kiefer v. Rogers, 19 Minn. 32, 42 (1872):

"It is true that a false representation in respect of an immaterial fact, as it can occasion no injury, is no ground for relief."

Therefore, appellants cannot be heard to complain insofar as the immaterial misrepresentation regarding the equipment they were induced to purchase as they received for their money precisely what they bargained for and in no way did the equipment, which apparently functioned as represented, contribute to their losses. See Saupe v. St. Paul Trust Co., 170 Minn. 366, 212 N.W. 892 (1927).

Appellants have also raised in this appeal the question of appellee's fraudulent inducement of the contracts of indebtedness at the outset of appellants' enfranchisement as a dealer. It is appellants' position that under Minnesota jurisprudence, appellee is chargeable with fraud in holding itself out as an expert in the poultry growing and processing operation and then failing to discharge its obligation as pledged at the inception of its contractual association with appellants. In this regard, appellants stress the point that an action or defense of fraud in

Minnesota does not require as a matter of law proof of any wrongful motive or intent to deceive on the part of the representer, but merely that the misrepresentation was made unqualifiedly and as of the representer's own knowledge with the intent to induce the relying party's action. Citing, e. g., Swanson v. Domning, 251 Minn. 110, 86 N.W.2d 716 (1957) ; Spiess v. Brandt, 230 Minn. 246, 41 N.W.2d 561, 27 A.L.R.2d 1 (1950); Helvetia Copper Co. v. Hart-Parr Co., 137 Minn. 321, 163 N.W. 665 (1917); Chippewa County State Bank v. Kief, 172 Minn. 412, 215 N.W. 833 (1927); Schlechter v. Felton, 134 Minn. 143, 158 N.W. 813, L.R.A.1917A, 556 (1916).

We agree with appellants' statement of the law in Minnesota, but after careful analysis of their authorities conclude that they lend no support to their allegation of fraud based on appellee's initial promises and opinions. In all of the aforecited cases, the fraud alleged affects the consideration bargained for and given in exchange by the parties to the agreement involved. In summary, while it is true a deceitful scienter is not required to support a recovery or defense sounding in fraud, in such actions the party urging fraud in the inducement cannot make out a case where he has gotten all that he believed he was to receive in reliance on the representer's inducements.

For example, in Kiefer v. Rogers, supra, the plaintiff purchased property from the defendant on the latter's assurance it was encumbered with but one mortgage. In fact, a second encumbrance existed unbeknown to plaintiff and defendant at the time of the conveyance. In awarding the plaintiff the equitable relief of cancellation of the conveyance, the Minnesota Supreme Court held the defendant responsible for his "fraudulent representation", the result of gross negligence and not deceit, which prevented the plaintiff from obtaining that which he believed he would receive under the terms of the contract, to-wit: certain realty encumbered with but *one*

*mortgage.* This is the converse of the case at bar wherein Ralston Purina, under the contracts in question, promised to furnish the Lacks with poultry feed and capital loans which the Lacks received exactly as represented. Appellee's original pledge of advice and supervision of appellants' operation was ancillary and not a part of the consideration, the subject matter of the parties' contracts. At the very most, these collateral promises made in good faith could be construed as independent representations, not of existing or prior facts, but of events that might take place in the future. As stated in Bakke v. Keller, 220 Minn. 383, 19 N.W.2d 803, 809 (1945):

> "It is well settled that misrepresentations as to future events when not made to deceive do not authorize the rescission of a contract although the contingencies do not occur as represented."

Accord: Bigelow v. Barnes, 121 Minn. 148, 140 N.W. 1032, 45 L.R.A.,N.S., 203 (1913).

Appellants further urge that it was a form of fraudulent concealment for appellee to recommend that appellants institute a "crash" expansion program in January, 1959 while not disclosing thereafter to appellants known financial pitfalls to its effectuation. It is true that by this time in the sequence of events, Ralston Purina, having at the outset assumed an independent duty of reasonable care in the discharge of its guidance and management service afforded its new dealer, Lack, was now in a posture where it could evaluate that duty's fulfillment. However, the totality of appellee's knowledge and advice must be weighed in light of a publicized declining poultry market in determining whether or not appellee breached a reasonable standard of care in the performance of this assumed duty.[3] Besides, the past experience of Lack and his knowledge of the

business risks involved in expanding his operation in the wake of a declining market must also be given due weight in conjunction with Ralston Purina's discharge of its duty before deciding whether the latter is liable for any fraud or negligence. During the period of expansion, no one opinion or piece of information harbored by appellee concerning appellants' high overhead or its unannounced fear of appellants' possible bankruptcy from over-expansion may be singled out from the entire context of the above factors in deciding the question of appellee's accountability to appellants for fraud or negligence.

Considering these alleged concealments in the perspective of appellants' knowledge of existing conditions, past experience, and assumed risk, they simply do not fit Minnesota's definition of actionable fraud. Hanson v. Ford Motor Co., supra. In most instances the alleged concealments have nothing to do with past or present facts in that they occurred after the contracts of indebtedness sued upon were incurred. Fraud cannot be predicated upon concealments of superior knowledge arising subsequent to the acts of appellants claimed to have been induced by appellee's acquiescence therein. Rien v. Cooper, supra. Furthermore, the statements comprising the alleged concealments were criticisms, opinions and proposals for recommended changes in appellants' operations, which even if made known to appellants would have provided no ironclad justification for reliance thereon. See Bigelow v. Barnes, supra. Perhaps the assumptions of Ralston Purina in advising appellants throughout the expansion program were based on conclusions negligently formulated; yet there is no evidence of fraud. Notwithstanding that proof of fraud requires no showing of a wrongful motive, the difference in degree of fault here warrants a narrower liability for negli-

---

3. Explaining the chief problem causing Lack's losses, Lack's own accountant testified:

"We were in a cost-price squeeze * * * where the selling prices have been depressed and the costs are staggering and the more we sold, the more we lost."

gent than for intentional misstatement or deceitful concealment. The trial judge in submitting only issues of negligent misrepresentation to the jury did not misinterpret the law applicable to the pertinent evidence. As to these representations and nondisclosures arising during the parties' dealings but unrelated to the consideration exchanged under the contracts of indebtedness, appellee's duty was that of reasonable care. It was the jury's province to determine if that duty had been breached.

Furthermore, we are not swayed by appellants' argument that the jury verdict reflecting an award to appellants in response to the submissible issues of negligence, establishes as a matter of law the defense of fraud to all appellee's contract actions. Appellants' premise is that in Minnesota an action for negligent misrepresentation sounds in fraud, not negligence, and that the elements necessary to sustain actionable fraud in a tort are the same to support the defense of fraud in a contract action.

The court in Schlechter v. Felton, supra, made it quite clear that the wrong involving intentional or negligent misrepresentation sounds in tort, but that in calling it fraud the name was not important. (But see Leighton v. Grant, 20 Minn. 345 (1874) wherein the Minnesota Supreme Court formerly distinguished in the outcome of an action grounded on unintentional as opposed to intentional misrepresentations.) Since the Minnesota Supreme Court now intends no peculiar legal significance to be accorded the action's nomenclature, it begs the question in the instant case to classify the negligence resulting in the set off allowed appellants as fraud and conclude thereby that a prima facie defense has been established to appellee's contract action.

We reemphasize the point that in all appellants' authorities, the involved misrepresentations classified by the courts as fraud bear on the consideration promised by the parties to their contract. That is to say, the false representations, negligent or intentional, prevented the complaining party from receiving that which he had been induced to believe he would obtain under the terms of the contract. Another illustration worthy of comment is the case of Newell v. Vandall, 32 Minn. 171, 19 N.W. 972 (1884). There, it appears plaintiff was allowed to replevy goods sold the defendant in a credit transaction upon learning that despite plaintiff's inquiry, the defendant concealed indebtedness which affected his credit standing. It is apparent why the court would permit the aggrieved party to the contract to raise the fraud via a defense to the transaction's enforcement, as a cause of action to rescind the contract, or alternately, affirmation of the contract with a suit for damages for breach. L'Evesque v. Rognrud, 254 Minn. 55, 93 N.W.2d 672 (1958). See also Chippewa County State Bank v. Kief, supra. But to apply this line of cases to nullify any recovery on the contracts in this case in which the agreements' considerations are independent of the issues of negligence, would pervert their rationale. Thus, while it may be true that a negligent misrepresentation is defined as a tortious fraud, with elements coincident with contractual fraud, it does not follow that a recovery for tortious fraud necessarily establishes a defense to unrelated contracts.

And finally we find no merit to appellants' contention that the trial judge erred in not submitting to the jury any issue of fraud or negligence regarding Ralston Purina's alleged fault for undetected errors in appellants' financial books. From the evidence, it appears that the responsibility for these undetected discrepancies must be assumed by appellants' own employees and retained auditors whose primary duty it was to post and check the accuracy of the entries contained therein.

## DAMAGES

With respect to the contracts of indebtedness, the trial court correctly instructed the jury that there was no element of fraud for its consideration and that the principal amount and interest due appellee on the notes and open account totalled $156,390.83. Absent fraud

as a defense to the obligations, the court correctly directed a verdict in favor of the appellee in the above amount, with further instructions to set off against said amount such damages as the jury might find were caused by appellee's negligence. The jury's verdict of $48,966.62 indicates appellants were allowed damages in the amount of $107,424.21. Appellants contend their set off was improperly limited to operating losses, in that they are also entitled to recover for certain plant machinery depreciation and loss of their individual investments in the corporation, both caused by the fraudulent misrepresentations alleged in their amended counterclaim.

 Having heretofore rejected all appellants' allegations of fraud, these damages may only be recovered if they were erroneously excluded from the jury's consideration in assessing appellants' losses attributable to the negligent misrepresentations. In fraud and misrepresentation actions generally, Minnesota has adopted the minority damage rule limiting the injured party's recovery to his out-of-pocket losses which are the direct, proximate and natural consequence of his acting on the faith of the defendant's representations. Hanson v. Ford Motor Co., supra; Walsh v. Paine, supra. Stated differently, but to the same effect, the test is "what has the plaintiff lost as a proximate result of the defendant's misrepresentations?" See General Corp. v. General Motors Corp., D.C., 184 F.Supp. 231 (Minn.1960). In those cases in which the consideration received under the contract was less than what was fraudulently misrepresented, the injured party's measure of damages under the out-of-pocket rule is the difference in value of what he parted with and what he got. Lehman v. Hansord Pontiac Co., Inc., 246 Minn. 1, 74 N.W.2d 305 (1955). However, invoking this rule

with respect to appellee's negligent misrepresentations pertaining to its advice and guidance of appellants' operation, the measure of damages is not immediately ascertainable because there was no exchange of consideration pursuant to any contract to determine the difference between "what was parted with and what was gotten".

 However, the trial judge's instruction that the allowable award to appellants for any negligent misrepresentation found should be limited to operating losses sustained from August, 1958 to September, 1959, is a proper correlation of the out-of-pocket rule to the submissible negligent misrepresentations of this case. Any direct and proximate loss sustained by appellants in reliance on such misrepresentations would logically manifest itself in the form of operating deficits. The operating losses as found by the first year's audit amounted to $107,424.21. The net verdict implied the set off corresponded to this figure.

 By no twist of the imagination do appellants' individual investments in the corporation represent recoverable, out-of-pocket losses in this instance. Nor has any authority been cited to recover same under comparable circumstances. These contributions were not proximately induced by any misrepresentation of appellee. Furthermore, any resulting loss of a secondary nature to appellants as individual corporate shareholders and guarantors of its obligations is not a proximate consequence of the representations respecting advice and guidance addressed to appellants in their corporate capacities.[4]

 Recovery for the property depreciation incurred after appellants closed down these businesses neither can be found to have been proximately caused by the considered misrepresentations.

4. Recovery for appellants' individual investments would have been tantamount to burdening appellee with the unassumed obligation of an indemnitor or insurer of the success of appellants' independent, business venture. Moreover, any funds contributed to the corporation in the form of stock purchases or capital investments were utilized either for operational expense, compensated by the allowed recovery, or for physical plant expansion which appellants retained intact when they elected to go out of business.

This damage primarily resulted from appellants' own decision, upon advice of their accountant, to cease operations and not through any fault of appellee. Moreover, after appellants discovered the misrepresentations, which presumably occurred no later than the date they received the year-end audit showing a large deficit, it was incumbent upon them to make a bona fide effort to mitigate any damages. Lowrey v. Dingmann, 251 Minn. 124, 86 N.W.2d 499 (1957). The evidence does not indicate that such an effort was made, but rather appellants after voluntarily phasing out its operations not only permitted the plant and equipment to remain idle but made no attempt to sell, lease or dispose of the property otherwise on the open market. Since the representer is not a guarantor, the victim of misrepresentation may not irresponsibly accumulate his losses to the detriment of the misrepresenter.

Finding no error in the trial judge's order awarding appellee a new trial, his subsequent instructions to the jury, and its resultant verdict, the decision below is therefore affirmed.