CLEMENTS AUTO COMPANY, dba
Southern Minnesota Supply Company,
SM Supply Company, a Wisconsin cor-
poration, and SM Supply Company, a
Minnesota corporation, Plaintiffs,

v.

The SERVICE BUREAU CORPORA-
TION, Defendant.

No. 3–68 Civ. 240.

United States District Court
D. Minnesota,
Fourth Division.

March 31, 1969.

Blethen, Ogle, Gage & Krause, by William C. Blethen and Kelton Gage, Mankato, Minn., for plaintiffs.

Rider, Bennett, Egan, Johnson & Arundel by Stuart W. Rider, Jr., and Richard J. Nygaard, Minneapolis, Minn., and Michael Wolcott, New York City, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

MILES W. LORD, District Judge.

This case arises out of a business relationship between the plaintiffs and the defendant which began in 1962 and continued through January, 1967. During

that period a number of contracts were entered into by the parties pursuant to which the defendant provided data processing services. The plaintiffs seek damages on various theories—misrepresentation, breach of contract, reformation, and recission. The defendant denies these claims and seeks, in a counterclaim, to recover certain sums still owing under the contracts.

The plaintiffs are Clements Auto Company, a Minnesota corporation, SM Supply Company, a Minnesota corporation, and SM Supply Company, a Wisconsin corporation. Clements Auto Company conducts two businesses at Mankato, Minnesota—a Chevrolet dealership, which is not involved in this lawsuit, and the Southern Minnesota Supply Company, a wholesale house. SM Supply Company, a Minnesota corporation, conducts a similar wholesale supply house at Rochester, Minnesota. The Wisconsin corporation operates a wholesale supply house at Eau Claire, Wisconsin. During the time in issue it operated a similar business in La Crosse, Wisconsin. All three corporations are wholly owned subsidiaries of F. B. Clements & Company, a partnership. This family business owns the stock of various other corporations doing business in southern Minnesota. Since all of the contracts and business transactions involved in this case were executed on behalf of all of the plaintiffs, they shall be referred to jointly as SM Supply.

The defendant, Servic Bureau Corporation (SBC), is a New York corporation. It is a wholly owned subsidiary of International Business Machines Corporation (IBM). SBC is engaged in the business of electronic data processing and offers its services to the public in 84 branch offices throughout the United States. It sells data processing services in the following areas: payroll, personnel records, accounts receivable, billing, sales accounting, marketing studies, cost accounting, inventory records, budgets, and general accounting.

The amount in controversy exceeds $10,000. This Court has jurisdiction under 28 U.S.C. § 1332.

The Court has concluded that the plaintiffs have established their cause of action for misrepresentation and are entitled to substantial damages. Before the misrepresentations which form a basis for this cause of action are discussed in detail, it is necessary to give an outline of the business relationship between SM and SBC and to describe in general terms the data processing system SM adopted.

The wholesale houses operated by SM Supply handled automotive parts and supplies; electronic parts, supplies and equipment, including radios and TV sets; and electrical materials used in all types of industrial and residential construction and lighting fixtures. Each of the four stores stocked and maintained more than 60,000 items of inventory in amounts ranging from one to several thousand each. In general, the accounting for all four stores was done from the store at Mankato, Minnesota, which can be considered the headquarters of SM Supply.

Prior to 1962 both Charles R. Butler, one of the plaintiffs' officers,[1] and Vernon L. Droog, the general manager of SM Supply, thought that inventory problems in the four stores kept the business from being more profitable. Specifically, these men thought that the dollar amount of inventory was too high and the turnover rate too low for effective operation. Because of the large number of parts kept in stock, SM Supply buyers would, on occasion, lose track of the amount of stock on hand. They would buy either too much or too little. SM Supply would then either have an excessive amount of stock on hand which would become obsolete, or encounter out-of-stock situations. Whatever the result, in the opinion of Mr. Droog and the senior Mr. Butler, SM Supply's business would suffer.

During that same period, the plaintiff, Clements Auto Company, had had a suc-

---

[1]. Hereinafter referred to as the senior Mr. Butler. His son, Charles C. Butler, another officer of SM Supply, will be referred to as the junior Mr. Butler.

cessful experience with a data processing system providing inventory control reports in the Chevrolet dealership at Mankato. This system, known as AID, was installed and operated by SBC. It provided regular reports showing what parts were on hand or on order and automatically computed an anticipated order based on a predetermined level of supply. The Clements Auto Company found that this system provided excellent control of the Chevrolet parts inventory.

Mr. Droog, prior to 1962, had described the SM Supply operation to various data processing experts. He had been told that it would not be possible to obtain an effective inventory control report for a business like SM Supply with a large number of items in stock from various manufacturers. The senior Mr. Butler had also contacted SBC representatives from time to time asking if they could install a similar data processing system for inventory control at SM Supply. The defendant's agents at first advised him that they lacked the computer capacity to install such a system. In the summer of 1962, SBC advised SM Supply that early in 1963 it would acquire an IBM 1401 computer which would have the capacity to produce data processing services for SM Supply.

Representatives of SBC offered to study SM Supply's business and methods of operation during the summer or fall of 1962 in order to propose data processing services. The defendant's agents spent approximately eight to ten days on the plaintiffs' premises inspecting the inventory, books and records to determine the amount of business conducted by SM and to assess its data processing requirements. At this time SM Supply maintained manual inventory records of a "Cardex" or "Buchan" type. If properly maintained, such records would provide a history of movement of the item as well as an on-hand figure. However, this system was not always kept up to date, and did not apply to all of the items in inventory. The SBC representatives agreed with Mr. Droog and the senior Mr. Butler that the inventory and other existing records were generally incomplete and inadequate.

On or about December 20, 1962, SBC presented a proposal to SM Supply (Plaintiffs' Exhibit 1), which was accompanied by a letter of transmittal dated December 19, 1962 (Plaintiffs' Exhibit 2), a letter dated December 19, 1962 (Plaintiffs' Exhibit 3) from the Friden Company, and two proposed contracts (Plaintiffs' Exhibits 4 and 5). The letter from Friden presented a proposal to SM Supply (incorrectly called "3M Supply Company") concerning the sale or lease to SM Supply of eight Friden Flexowriters to be used to provide input for SBC's computer operation.

The defendant proposed, in essence, an automated accounting system. SBC representatives stated that it was necessary for SM Supply to automate its accounting if inventory control information was ever to be obtained. SBC proposed to supply invoices, monthly statements to customers, monthly sales analysis reports, aged accounts receivable trial balances, and certain other reports described in the first contract (Plaintiffs' Exhibit 4). From information supplied by SM Supply, SBC was also to produce weekly sales reports which would show sales movement of each item in each of the four stores during the current week and five previous weeks.

SBC proposed that Friden Flexowriters be used by SM Supply as the input device for this data processing system. The Flexowriter is a device which can produce punched paper tape for computer input and simultaneously type the information on a piece of paper (often referred to as a "hard copy"). Input to the Flexowriter can be provided by edge-punched cards which are read by the machine or by hand-keying information on a keyboard similar to an electric typewriter keyboard.

In addition to being able to produce this "hard copy", the Flexowriter could be used in a system which uses "numbers" consisting of letters of the alphabet and characters such as dashes and slants as well as numerals. It could also

read cards with more than 80 items of information recorded on them. These capabilities met requirements which SM Supply desired in its data processing system. SBC represented that with the Flexowriter SM Supply could, as it wished, send a typed copy of the invoice with the shipment to the customer. SBC also indicated that it would train SM Supply personnel to be Flexowriter operators, and that such personnel could operate the device in such a manner that input for the data processing system could effectively be supplied. SBC also stated that the proposed system, using Flexowriters, could be operated without additional personnel.

As outlined in SBC's proposal, the first step in the new SM Supply operation was for a salesman to fill out an order form. A copy of this form was then edited and given to the Flexowriter operator. She would select a customer card from tub files alongside the machine. When this card was inserted in the machine, the customer's name and address would be printed out, together with other information such as the branch number, the date, and a portion of the invoice number. The operator could hand-key in the remainder of the invoice number.

For each item sold to this customer the Flexowriter operator was to select an item card from the tub files surrounding the machine. She inserted the item card, and the machine automatically typed out the part number, the vendor's (manufacturer's) name, and other information. The operator had to select which of four price fields was applicable, and she was required to hand key in the quantity sold. Otherwise the information would automatically be printed out.

In certain circumstances the operator had to hand key all the information on the item card. This would happen when no item card could be found, whether by reason of misfiling or because price changes were presently being made on the card. It would also happen when the item was one which SM Supply did not carry in inventory and thus no master card was prepared. A significant number of items were handled in that manner by SM Supply, possibly as many as 20% of the total number of items sold. Special cards were inserted by the Flexowriter operator for special transactions and to total the invoice. The paper tape produced by the Flexowriters was sent to SBC in Minneapolis. Invoices, statements, and reports would then be prepared on the computer and returned to SM Supply.

In conjunction with this proposal, representatives of SBC had long discussions with SM Supply personnel. In the course of these discussions, or in the proposal itself, SBC representatives indicated that the system was so designed as to prevent all but a minimal number of errors. In the proposal itself the statement was made that the reports to be received would permit "management by exception." At the time of the original proposal SBC personnel did not promise or guarantee that SM Supply would receive inventory control reports during the first year, but they did represent to SM Supply that the system proposed was so designed as to be capable, when it was fully implemented, of providing information in such a form that it would constitute an effective and efficient tool to be used in inventory control.

Sometime in February, 1963, SM Supply signed two contracts. Contract SM 252–3389 (Plaintiffs' Exhibit 4) provided that SBC would produce the reports indicated therein and also invoices and statements. This was the basic contract during the entire business relationship. Contract SJ 252–3390 (Plaintiffs' Exhibit 5) provided for the programming necessary to produce the reports. These contracts were accepted by SBC at its New York office in April of 1963. (The contracts had been approved by the SBC operations manager in Minneapolis, Rocco Di Nigris, before they were presented to SM.)

*The System in Operation.* After the contract was signed, SBC and SM Supply personnel worked together to set up the system. SM Supply obtained eight Friden Flexowriters under a leasing ar-

rangement with Transport Leasing Co. SBC and Friden personnel trained SM Supply employees in the operation of the Flexowriters. Card files were created to be used by the operators. Item card files were made consisting of from 25,000 to 35,000 separate cards. It was necessary to determine exactly how the information was to be printed so SM and SBC personnel discussed the reports to be received. By September, 1963, the system was in operation at the Mankato store. The Rochester store was added at the end of that year. Not until April, 1964, were the Wisconsin stores added to the system.

The initial installation of this data processing system was expensive. By the end of June, 1964, SM Supply had paid more than $37,000 to SBC and almost $10,000 to Transport Leasing. This sum of $47,000 does not include additional clerical costs, additional supplies, and the amount of time spent by SM Supply management in supervision.

SM Supply encountered immediate difficulties in producing input for the computer. The Flexowriter operators fell behind in production. This delay caused SM Supply to have the Flexowriters operated from early morning until the evening, in excess of normal business hours. Because of this delay, it was apparent at the start that the "hard copy" could not be produced in time to be sent with the goods sold.

SM Supply was also unsatisfied with the product it received from SBC. The 1964 sales report did not contain any on-hand figure, and had a movement history of only six weeks. SM Supply buyers could not use it alone as a buying guide, but were forced each week, or whenever they ordered, physically to check the level of stock on the shelves. Furthermore, there were errors in the reports; many items appeared out of sequence and thus could not be considered by the buyers. The reports were also voluminous and difficult to use. The buyers found the six weeks' history of movement insufficient. SM Supply was also dissatisfied with the frequency of errors in invoicing and billing.[2]

The sequencing error mentioned above must be described in more detail. This error appeared in the weekly, sales reports, which were designed to provide SM Supply buyers with information regarding past movement of a particular part. Each item that had moved would be reported. Items were to appear in categories for each vendor (manufacturer) according to part number. Ideally, the buyer would be able to go through this list and see the movement of each item sold by a particular manufacturer. The computer would automatically print out these items according to a predetermined sequence.[3]

There seems to be no dispute that the computer could and did properly print out all the part numbers supplied it in the predetermined order. The problem was that the information given the computer frequently contained part numbers which had been mistyped. This error arose when an operator had to hand key a part number (and a vendor's symbol which followed similar rules) into the system. If one of the characters in the part number was transposed, that part number might appear far out of the normal sequence. Furthermore, the

2. For example, split invoices, double billing, and decimal errors. Of course, the sequencing error, discussed below was reflected on invoices by a charge for a non-existent part.

3. Manufacturer's part numbers varied from all numeric numbers to "numbers" containing letters and special characters such as dashes, slants or blanks. The sequence for ordering these numbers was to give a value to all the characters. Blanks, dashes (–), and slashes (/) were given the highest value. Then the alphabetic characters in normal order, followed by numeric characters from 0 to 9. Numbers were sorted by comparing the characters in that number position by position from the left. Thus all numbers beginning with 1 would precede all numbers beginning with 2. 1119 would precede 2, 3 or 4. Since "special characters" had a higher value, 1–1 would precede 1A1, 101 and 11. The following numbers are in the correct sequence: 4–21, 4A21, 4121 and 421.

movement history on that part would then be incorrect, for the misreported movement would appear under the spurious, not the correct, item. Likewise, if one of the characters in the vendor's name was in error, the report would show a vendor of that new, but erroneous, name. The part number would then be correctly listed under a non-existent vendor whose name would appear apart from the intended vendor in the print out. Again, the movement history would be lost.

The practical result is that an SM Supply buyer could not look at the line for one item on the weekly sales report and be sure that all the movement of that item was reflected there. If an erroneous part number or vendor's name were reported, the movement erroneously reported would not be reflected on the line the buyer normally would look at. Furthermore, the erroneous item would be reported for the next five reporting periods and then be dropped from the report; the movement erroneously reported would never be recovered. The SM Supply buyer, from the reports he received from SBC, would never be able to consider that movement in making his purchases, unless he had noticed the erroneously reported item.

The "field" provided in the Flexowriter card for the vendor name and the part number totalled 27 spaces. It is not disputed that if those fields contained the designated number of spaces, the computer would accept and print out the name and number given. There was no check built into the computer or the Flexowriter to control or catch numbers or names in which characters were transposed.[4] The operator might catch it on the "hard copy" typed up by the machine, but this was was the only "control" which was designed to catch this particular error.[5] Such errors did occur and resulted in transposition of items in the reports.

The complaints about insufficient history being given led to a change in the sales report in August, 1964. At that time the parties agreed to change this weekly report to a bi-weekly report which showed movement of items during the past two-week period and during the previous five two-week periods. Originally, SBC representatives stated that additional history could not be given without expensive reprogramming. The existent format of the report limited the movement history to six periods. Someone, either from SBC or SM Supply, suggested that greater movement history could be obtained merely by doubling the length of time reflected in each of the six columns. The buyers thus were given a total of twelve weeks' history of movement of each item.

During this time SM Supply and SBC had signed other contracts in accordance with which SBC provided such services as producing inventory cards, inventory reports, and punched paper tape from which Flexowriter card files could be created for the Rochester and Wisconsin branches.

In September and October, 1964, SM Supply and SBC, respectively, signed a contract (Plaintiffs' Exhibit 11) which provided for a bi-weekly inventory control report. This report differed from the others in that it showed purchases and receipts by SM Supply, inter-branch transfers, and an on-hand balance of items for certain vendors selected by SM Supply. This report was frequently re-

4. This lack of control of transposition errors contrasts with the control possible in systems using eight digit numeric systems. In such systems the eighth digit is a self-checking digit. The computer, by making various computations with the first seven digits of the number, and checking the result against the eighth digit, can automatically check to see if any of the first seven digits is transposed.

5. If this hard copy had been produced in time to accompany the order, then the customer would have been able to report to SM Supply that the part number was erroneous. Of course, this means of "control" would not have altered the sales report, but it would have permitted the buyer to note the error.

ferred to as the second generation, or 1965 report, during the trial.

By the end of 1964, SM Supply had abandoned its Cardex system. It had no bookkeeping records of its own. All of SM Supply's accounting and inventory records were in the possession of SBC. By the end of that year SM Supply had paid SBC $63,884 and Transport Leasing $18,096 for a total of $81,981. The second generation report began early in 1965 and continued until December 4, 1965. Although this report did contain information not given in the earlier reports, its usefulness was limited by the fact that the same sequencing errors occurred. An SM Supply buyer could never depend on any particular item to be accurate. The report continued to be quite as voluminous as the previous reports.

The next major change in the relationship between SBC and SM Supply was the signing of contracts for the third generation (1966) inventory reports in December of 1965 and January, 1966. These contracts (Plaintiffs' Exhibits 14 and 15) provided for a new type of sales report which incorporated a fourteen-month movement history. The report was also to supply an on-hand figure and a computation of the number of weeks supply on hand for each item. By the end of 1965, when this new report was anticipated, SM Supply had paid SBC a total of $129,136; Transport Leasing had been paid $34,564. Without including any expenses for supplies or wages, SM Supply had spent $163,701 on this data processing system. If the sums which SM Supply contends it had spent for increased clerical costs ($24,135), increase in cost of supplies ($31,756), and executive salaries for activities connected directly with supervision of this data processing system ($49,000) for the years 1963 through 1965 are included, a sum of $104,892 must be added to make a total to that time of $268,593.

The 1966 inventory control report was scheduled to begin in the fourth week of January, 1966. SM Supply had stopped receiving the previous bi-weekly inventory report on December 4, 1965. The fourteen months of history to be given by the 1966 report were to be taken from the quarterly movement reports maintained in defendant's costing master file and reported previously as part of the annual inventories for 1963 and 1964. This report was delayed. By March, 1966, it became clear that a programming error had been made which caused certain of the quarterly movement reports to be in error.[6] SBC thereupon was obliged to reprogram the 1966 inventory report to capture as much movement as it could from other sources. The plaintiffs received no regular report until July, 1966. That report did not contain a complete fourteen-month movement, and the on-hand figures were out of date.

Because the reports were delayed and did not provide fourteen months of movement history, SBC and SM Supply agreed that SM Supply would pay only eleven-fourteenths of the amount SBC charged for the July, 1966 report which contained eleven months' movement history. In the following month SM Supply would pay twelve-fourteenths of the amount charged, and so on until the full history was received and the full price paid.

---

6. This error appeared only with respect to movement of new parts acquired during each respective year. As to those parts, it appeared only during the quarter in which the new part was added to inventory and in previous quarters. A reporting of zero movement for a new part was an accurate report. The on-hand figure in the year-end inventory report was not affected by the error. Each new part that may have been added was corrected at the end of the year. New parts added to the inventory constituted approximately 5% of the total inventory.

The error, however, was a random error. SM Supply buyers would not normally be able to determine which items were in error. The error was discovered at the urging of SM Supply employees who happened to discover erroneously reported movement in the quarterly movement report of the 1964 year-end inventory report.

These third generation reports presented still more information than the earlier reports in a manner which should have been helpful in inventory control. But they still were affected by the sequencing errors previously described which rendered them so cumbersome and inaccurate that they did not in fact supply information which the SM Supply buyers could accept as reliable.

In 1966 SM Supply retained the services of Anderson, Kasden, O'Brien & Walter (AKOW), a Minneapolis data processing and systems design consultant firm. This firm analyzed the supply company's needs and prepared specifications which were sent to several data processing service bureaus in Minnesota, including SBC, for bids. These bid specifications provided for paper tape input and required reports substantially similar to those designed and provided under defendant's system. By the end of June, 1966, when AKOW would have received and analyzed these bids for data processing services, the amounts paid by SM Supply to SBC and Transport Leasing, together with the amounts outlined above for increased expenses and wages, including certain executive salaries during 1962–1965, totalled $303,289.

During the last half of 1966, SM Supply obtained from SBC a copy of the costing master file so that it could be given to Computo Service, Inc., of Mankato, Minnesota. SM Supply terminated all relations with SBC in January, 1967, at which time Computo Service began to provide it data processing services. During the time SM Supply did business with SBC, SBC had billed SM Supply a total of $216,592.90, of which $192,551.65 was paid. SBC is counterclaiming for the unpaid balance of $24,041.25.

### The Cause of Action for Fraud

█ Under Minnesota law, which applies to the tort action stated in the complaint, there are eleven elements to a cause of action for fraud or misrepresentation:

1. There must be a representation;
2. That representation must be false;
3. It must have to do with a past or present fact;
4. That fact must be material;
5. It must be susceptible of knowledge;
6. The representer must know it to be false, or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false;
7. The representer must intend to have the other person induced to act, or justified in acting upon it;
8. That person must be so induced to act or so justified in acting;
9. That person's action must be in reliance upon the representation;
10. That person must suffer damage;
11. That damage must be attributable to the misrepresentation, that is, the statement must be the proximate cause of the injury.

Davis v. Re-Trac Mfg. Corp., 276 Minn. 116, 149 N.W.2d 37 (1967); Hanson v. Ford Motor Co., 278 F. 2d 586 (8th Cir. 1960).

The Court concludes that all of these elements of the cause of action are fulfilled with respect to several of the representations made by SBC personnel to employees and officers of SM Supply.

█ 1. In the course of discussions between SBC and SM Supply regarding the proposed data processing system, both Mr. Franklin A. Sylvester, who at that time was Manager of Sales in the Minneapolis branch of SBC, and Mr. Herman Joern, an SBC sales representative, told the senior Mr. Butler and Mr. Droog, the SM personnel primarily involved in adoption of this data processing system, that the only way SM Supply would ever get an inventory control system such as that in use at the Chevrolet dealership would be by automating the firm's accounting.

At that time SM Supply's accounting was done manually, using Burroughs' machines. This system had functioned satisfactorily and provided adequate bookkeeping records. It was with re-

spect to inventory records that SM Supply encountered difficulties.

If SBC's representation that it was necessary to automate the accounting system is to be actionable, it must be a statement of a past or present fact, not merely the opinion of the speaker or a prediction of probable future events. See Kennedy v. Flo-Tronics, Inc., 274 Minn. 327, 331–333, 143 N.W.2d 827, 830–831 (1966); Forsberg v. Baker, 211 Minn. 59, 300 N.W. 371 (1941); Lack Industries, Inc. v. Ralston Purina Co., 327 F.2d 266, 278 (8th Cir. 1964). Properly analyzed, this representation is such a statement of past or present fact. The SBC representatives were not predicting the success of the SM Supply system, or its relative chance of success vis-a-vis other systems. Their statement purports to be descriptive of the present (i. e. in 1962 or 1963) state of development of data processing systems. These SBC representatives stated that the only way the information necessary to produce an inventory control report like the AID system used in the Chevrolet dealership can possibly be obtained is by using the information collected through an automated billing system. In effect, the assertion is made that no other data processing scheme exists which could give a company such as SM Supply the inventory control information required.

■ This representation meets the requirement that it be susceptible of knowledge. It was possible for SBC, in 1962, to analyze the then developed methods and systems for obtaining inventory control reports and inventory information through data processing. The degree of development of new management techniques and the uses to which these techniques may efficiently be put are matters which not only can be known by experts in the field, but are expected to be known.

■ There is no proof that anyone at SBC knew this statement was false when it was uttered, but deliberate deception or scienter is not a necessary element of the cause of action for fraud in Minnesota. Hollerman v. F. H. Peavey

& Co., 269 Minn. 221, 228, 130 N.W.2d 534, 539 (1964); Lack Industries, Inc. v. Ralston Purina Co., 327 F.2d 266, 277 (8th Cir. 1964). It is sufficient if the speaker makes the statement as of his own knowledge without knowing whether it is true or false. Under Minnesota law an unqualified affirmation amounts to an affirmation of one's own knowledge. Swanson v. Domning, 251 Minn. 110, 114, 86 N.W.2d 716, 720 (1957); Spiess v. Brandt, 230 Minn. 246, 252, 41 N.W.2d 561, 566, 27 A.L.R.2d 1 (1950). In this case there is no evidence which indicates that either Mr. Sylvester or Mr. Joern qualified their representation in any way. It appears to have been an unequivocal statement to the effect that the accounting system was the only way SM would get the inventory control it really wanted.

■■ Of course, to be actionable, the representation must be false. The Court is satisfied that the testimony of two of the data processing experts who appeared at the trial establishes that other alternatives were available to SM in 1962. Mr. Thomas Dorsey, who is presently a specialist with the Control Data Corporation and who has had wide experience in the data processing field, stated that it was not necessary for SM to automate billing in order to get the inventory control information and reports required. In fact, he indicated that such an approach was less likely to succeed than other methods he outlined. The defendant's data processing expert, Mr. John R. Reed, who had equally impressive qualifications and who testified on behalf of the defendant, did not contradict Mr. Dorsey's conclusion that automated billing was not a necessity. Mr. Reed characterized the SBC system as "a valid approach" (emphasis added) to obtaining the inventory control desired.

It is clear from the testimony regarding this business relationship that SBC intended for SM Supply to act on the basis of this and other representations made. It is equally clear that SM Supply did act in reliance thereon. However, an analysis of these elements of the cause

of action, together with the damages incurred, can be postponed until other misrepresentations made have been discussed.

■■■ 2. SBC personnel also represented to SM Supply that there were controls built into the system which were adequate to prevent any but a minimal number of errors. The senior Mr. Butler testified that such a statement was made to him. A similar statement was also contained in the proposal which SBC sent to SM Supply in December, 1962. In that proposal various control mechanisms were described and this concluding comment was made: "Therefore, this program will provide iron-clad controls to insure accurate reports."

While the defendant maintains this latter statement was merely a summary of the specific control provisions outlined on that page, the Court is not willing to give it that narrow a reading. This page of the proposal describes certain complex control mechanisms. Their full significance could hardly be grasped by a person not acquainted with data processing systems. But the last sentence would leap out at the businessman studying this proposal. In this sentence SBC has represented to SM Supply that the proposed system has iron-clad controls, that the possibility of human error, if not eliminated, has at least been caught at every turn.

These statements were statements of fact. SBC described the proposed system. The fact represented was susceptible of knowledge, for SBC could analyze and describe the very system it designed. For the same reason, it was a statement made as of SBC's own knowledge—it was an unqualified affirmation that the system was designed to control human errors that might arise.

The statement is also false. At the very core of the input system—at the Flexowriter—there was built into this data processing system a proclivity for error which ultimately caused the weekly sales reports and the later bi-weekly sales reports to be replete with sequencing errors. As was discussed in some detail earlier, when a Flexowriter operator had to hand-key in an item, she had to complete a 27-digit field. The vendor's name could be as many as seven digits; the part number as many as twenty. Any error on the operator's part led to a new item being reported out of sequence.[7] The buyer would have difficulty finding that movement. For all practical purposes the information was unavailable, hidden somewhere in the pages of the reports. Furthermore, the movement reported under the correct number would now be incorrect.

Other errors crept in. There were problems with regard to split invoices. Errors occurred on the monthly statements to customers. SBC points out that these errors all were the result of input errors at SM Supply. There seems to be no dispute that, with the exception of one programming error, SBC itself made few mistakes in the actual operation of the system. However, the large number of errors which did occur in the reports were there because this system had not been designed as represented "to prevent all but a minimal number of errors". In fact, Mr. Reed, the defendant's expert, stated on cross-examination that a 27-position field is more difficult to control from an input error standpoint (i. e. punching it) than the 8-position field often used in other systems. He also admitted that a system such as that installed by SBC was error prone because the girl handkeying an item card had to enter a total of 75 key strokes without verification other than edit checks for formatting.

SBC argues that the evidence shows that the use of the Friden Flexowriter, with this 27-digit field for the vendor's

---

7. Because the Flexowriter operators frequently fell behind in their work, SM Supply executives were always seeking to speed up their production. This emphasis· on greater production at times put the operators under increased pressure. The transposition error was one which could easily result if the operators were under pressure.

name and the item number, was a necessity since Mr. Droog insisted on the use of the manufacturer's part number. Since the manufacturer's number often contained letters and special characters (dashes, slants, etc.) as well as numbers, and since, SBC argues, Mr. Droog refused to use a cross-reference table to an all numeric system, SBC could do nothing but use the Friden Flexowriter. Apparently this was the only machine which could be used to provide computer input for this type of a part number and which also could "read" a card with the amount of information SM Supply required. SBC seeks to establish that since SM Supply desired to use the vendor's number that SM Supply was wholly responsible for the choice of the Friden Flexowriter as an input device.

■ In the Court's opinion, there is no need to decide who was responsible for the choice of the Flexowriter, or who insisted upon the use of an alphanumeric rather than numeric part designation. There is no evidence in the record that SBC ever explained to SM Supply the error-proneness present in the use of the Flexowriter. This silence on the part of SBC, when taken in conjunction with the statement in the proposal that this system had iron-clad controls and the statement by Mr. Sylvester that the system was so designed as to prevent all but a minimal number of errors, in itself constitutes a representation by SBC. See Strand v. Librascope, Inc., 197 F.Supp. 743, 753 (D.Mich.1961); cf. Watkins v. Lorenz, 264 Minn. 471, 480, 119 N.W.2d 482, 488 (1963). The evidence presented at the trial establishes that SM Supply personnel were not experts in data processing. It is equally clear that SBC held itself out to be expert in that field, a subsidiary of IBM, the giant of the computer industry. In such a context, its failure to inform SM Supply of the proclivity to error of this system constitutes a representation that there was no such proclivity. Cf. Hollerman v. F. H. Pea-

vey & Co., 269 Minn. 221, 130 N.W.2d 534 (1964). If either Mr. Droog or the senior Mr. Butler prompted SBC to utilize the Flexowriter in the system proposed for use at SM Supply, by insisting that the manufacturer's part number be used, they did so without being aware of the possibility of error thus created and without being told of the consequences of their action.

■ 3. SBC also made false representations to SM Supply regarding the use and operation of the Friden Flexowriter. It should be remembered that SBC's statements to SM Supply regarding this system were made after it had made a detailed survey of SM Supply's requirements. SBC's own sales representative, Mr. Sylvester, testified that SBC personnel received excellent cooperation from Mr. Droog during the survey and that they had drawn on his knowledge of the business. After making this detailed survey, during which there was ample opportunity to determine what SM Supply's requirements would be, SBC proposed that SM Supply adopt a system incorporating a Friden Flexowriter. Several specific statements were made regarding this system and the use of the Flexowriter. The proposal (Plaintiff's Exhibit 1) stated that no additional personnel would be required. Mr. Sylvester and Mr. Joern told SM Supply personnel that the Friden Flexowriters could be operated by normal clerical personnel. (In the context of the prior survey, this comment must be interpreted to mean clerical personnel of the type then employed by SM Supply.) SM Supply personnel were also told that the Flexowriter would fulfill another one of their needs—that it would produce a typed "hard copy" of the invoice which could be sent along with the customer's order. SBC representatives also stated that the input in the data processing system proposed for SM could be supplied by eight Friden Flexowriters.[8] Finally, SBC made a more general representation that

---

8. Originally, the SBC representative said that six Flexowriters would suffice for the four stores, but because there was thought to be a need for two machines at each store, the number was raised to eight.

the Friden Flexowriter was a suitable input device in a data processing system which involved the circumstances presented at SM Supply.

The Court is satisfied that these representations about the use and operation of the Flexowriter were false statements upon which a fraud action can be based. These were not mere predictions of what the SM personnel were probably going to be able to do with the Friden machines. Rather, SBC told SM Supply that the Friden machine, if operated by normal clerical personnel, could efficiently produce the input necessary for this data processing system. When the statement was made that only eight machines would be needed, SBC made a statement of fact about the output of a Friden machine when operated by such clerical personnel.

With respect to the general representation, SBC did more than to merely predict that the Flexowriter would work. SBC made a statement of fact based upon its analysis of SM's needs and the Flexowriter's capabilities. SBC stated that the Flexowriter was suitable for the data processing system to be implemented at SM.

The evidence establishes that SBC erroneously made these representations.[9] Normal clerical personnel, such as those employed by SM, although they were reasonably efficient, were unable to create the input necessary for this system in the time anticipated. SM Supply not only had to hire more clerical personnel, it was also necessary to keep these machines in operation from early morning to late at night in order to complete the billing. A total of ten machines was ultimately acquired. The hard copy

never was produced in time to accompany the shipment. Finally, the Flexowriter was not a machine capable of fulfilling the input requirements of the SM system. There was an opportunity for errors to arise on handkeyed items; and there was also a delay in processing orders. When used in conjunction with 25,000 to 35,000 edge punched cards, with a filing system based on a complicated sequencing order, and in a field in which price changes frequently occurred, the Friden Flexowriter was not a suitable input device.

Again SBC argues that the choice of the Flexowriter was forced upon it by certain SM Supply requirements: SM Supply wanted to use the vendor's part number; SM Supply wanted to produce a hard copy packing slip; SM Supply required more than 80 units of information on the item cards. All these requirements, SBC argues, could only be met by the Friden Flexowriter. SM Supply did in fact establish these requirements, but that fact did not force SBC to choose the Flexowriter, *and* to represent that eight Flexowriters operated by normal clerical personnel could adequately produce the input needed to make the data processing system effective. It is not the choice by SBC (or SM Supply, for that matter) which is actionable, but SBC's representations about the Flexowriter operation.[10]

SBC contends that these representations were not false, and that the Friden Flexowriter did not work out in the SM Supply scheme because of errors and mistakes by SM Supply personnel or insufficient supervision. This objection overlooks the nature of SBC's representations—that SM Supply, without in-

9. It must be noted that the Court does not find, and there was no evidence at the trial, that the Friden Flexowriter is not a suitable input device when used in the proper circumstances. It appears that thousands of the machines are put to effective use throughout the country. The problem at SM Supply was not with the Flexowriter, but with an attempt to use the Flexowriter in the system designed by SBC.

10. SBC's representations about the system it proposed and the use of the Friden Flexowriter must be considered in context. Mr. Droog testified that he had presented his data processing problem to various experts at a Chicago convention. He was told by all of them that SM Supply's requirements could not be met. SBC, alone, told him it could be done.

creasing its clerical personnel and with the people then employed, could operate this system. The evidence indicates that regardless of the skill of the operator, it would have been humanly impossible to eliminate the errors built into this system.

■ 4. The fourth misrepresentation made by SBC was that the weekly sales management reports would allow management by exception. In the initial proposal, one of the claims made is that these reports were to be "valuable sales tools to allow management by exception." This statement is a representation of an existing fact, not an opinion. Management by exception is a concept well understood in the management consultant and data processing fields. It refers to the process whereby management concerns itself with what is unusual or different and not with the mass of repetitive detail. Management by exception is possible when problem areas are pinpointed and separated from the mass of detail. This statement in the proposal purports to describe the weekly sales reports. According to this statement, they are so designed as to permit management by exception.

These bulky reports were not in fact so designed. The detailed nature of the information provided, together with the bizarre reaction of the computer to a mistake in the typing of even a single character in the part number, caused considerable confusion. There was no reduction, collation, indexing, or pinpointing of this wealth of information to spotlight those areas which management needed to watch. SBC may have provided information which management could use, but its system was not designed to provide for management by exception. Its reports were in fact so designed as to make it almost impossible to provide any kind of management at a

price that a business of this kind would not find prohibitive.[11]

■ 5. In a related manner, SBC represented to SM Supply that the system proposed initially in Plaintiffs' Exhibits 1–4 would, when it was fully implemented, be capable of providing SM Supply sufficient information in a form such that when properly utilized it would constitute an effective and efficient tool to be used in inventory control. Contrary to the plaintiffs' claim, the evidence indicates that SBC did not purport to give a complete inventory control report during the first year this system was in operation. The testimony of Charles R. Butler, Charles C. Butler, and Mr. Droog, as well as of the SM Supply representatives, establishes that the system was to develop into an inventory control system with the addition of receipts and the other information necessary to provide an on-hand figure and a suggested amount to be ordered to maintain a proper stock on the shelves. But SBC indicated that when this information was added to the system, it could produce inventory control reports. It is impossible to construe the proposals to the senior Mr. Butler otherwise. He came to SBC with an inventory which was out of control and which was recognized by its representatives as his primary concern. He asked for something similar to the AID program at the Chevrolet dealership. SBC's proposals, while not stated in these exact words, meant at least this much: "We have designed a system which can meet your needs."

SBC's assurances that the system was capable of providing inventory control reports continued after SM Supply signed the initial contract. When SM Supply complained that the reports were inaccurate and inadequate, SBC did not back away from its earlier representations. In late 1964, when Mr. Droog ex-

11. During the summer of 1966, SM Supply had the consulting firm of AKOW secure bids from several companies for essentially the same services which SBC was then providing. In its bid, SBC indicated a probable cost of $7,000 to $10,000 a month for its services, as opposed to the $4,000 a month charged in the existent system.

pressed dissatisfaction with the material received, Mr. Rocco DiNigris, SBC operations manager in Minneapolis, told him that inventory control would not be achieved *unless SM Supply eliminated input errors;* the clear implication was left that SBC had done its part and that inventory control reports were possible, but for SM Supply's input errors. The history of this business relationship between SM Supply and SBC is marked by a continuing representation by SBC that the scheme proposed, with modifications to provide longer history or a slightly varied report format, could, when the on-hand figure and suggested order were added, provide the sought for inventory control.

These statements were not mere predictions or opinions expressed by SBC representatives. They were descriptions of the product SBC was marketing. As such, they were statements of a past or present fact which were susceptible of knowledge, and which can serve as the basis for a fraud action, if the other elements of the cause of action are established.

At the time the basic system was proposed, and throughout the years SM Supply sought to obtain a helpful inventory control report, these representations were false. The SBC system was so designed that there would always be error caused by hand keying items. It was so designed that SM Supply buyers would receive an unwieldy mass of information which could not be used efficiently. It was so designed that the raw information needed could not be reported rapidly enough to provide the buyers with the up-to-date information they needed. It was so designed that a reliable inventory control report could never have been produced in such form as to effectively be used by SM Supply buyers.

Other Elements of the Cause of Action

 The Court is satisfied that the representations discussed in detail above [12] were false representations of a past or present fact which was susceptible of knowledge and which SBC either knew to be false or, which is more likely, asserted as of its own knowledge without knowing whether they were true or false. These representations were material misrepresentations; they dealt with matters which were at the heart of any decision by SM Supply to undertake a data processing program.

 Under Minnesota law it is necessary that the representer, SBC, intend to have the other person induced to act by the statements made. In this case, all of the statements made by SBC were directed toward influencing SM Supply to purchase data processing services. The requisite intent is evident. It is also

12. There were other representations made by SBC which SM Supply charges should also serve as the basis for a fraud action. In the covering letter which accompanied the proposal, the statement is made that "proper use of the reports we are proposing should as a minimum objective, supply you with a 5% increase in sales and a 10% reduction in inventory." This is not a statement of fact. It does not describe the system proposed but rather states an objective which should be obtained by using that system. It is well established that a prediction or estimate cannot be the basis for an actionable misrepresentation. Cady v. Bush, Minn., 166 N.W.2d 358 (March 21, 1969) ; Kennedy v. Flo-Tronics, 274 Minn. 327, 143 N.W. 2d 827 (1966) ; Bigelow v. Barnes, 121 Minn. 148, 140 N.W. 1032, 45 L.R.A., N.S., 203 (1913).

The plaintiffs also seek to base their action for fraud on the alleged representation by SBC that six weeks' movement history would be enough. The Court finds that SBC never made such a representation, but that the six-week figure was adopted by SBC and SM Supply jointly. It is probable that this length of movement history was adopted because such a history of movement was given in the AID reports to the Chevrolet dealership. In any case, the length of movement history required in order to effectively restock the inventory is a matter on which the peculiar expertise of the defendant does not prevail. The plaintiffs' prior experience in the business was such that they had no right to rely on these representations, if they were made.

necessary that SM Supply act in reliance upon the representation made. The fact that SM Supply relied on SBC's representations is evident from its subsequent action. It agreed to adopt the proposed system. The senior Mr. Butler signed the initial contracts. Mr. Droog worked in close cooperation with SBC personnel to set up the system. SM Supply paid SBC a large amount of money. Since none of SM Supply's officers or managers was a data processing expert, SM Supply had to look to SBC for the information required to determine whether or not a data processing system could help to solve its inventory problems. SM Supply could not dispute the information given. It could only rely on the statements made by SBC. This reliance was justified. See Hollerman v. F. H. Peavey & Co., 269 Minn. 221, 130 N.W.2d 534 (1964).

### Damages

■ Proof that the plaintiff suffered some damage as the direct result of the misrepresentations made by SBC is the final element of a cause of action for fraud under Minnesota law. The measure of damages is the loss naturally and directly resulting from the fraud. It is composed of two essential elements —the difference between what the plaintiff paid SBC and the benefit received from the services rendered as well as such other special damages as were naturally and directly caused by the fraud. Hanson v. Ford Motor Co., 278 F.2d 586, 595 (8th Cir. 1960); Lowrey v. Dingmann, 251 Minn. 124, 86 N.W.2d 499 (1957).

The plaintiffs claim that their business would have been better off if it had been operated in the same manner as it was before SBC became involved. SM Supply also claims that SBC's services were of no benefit whatsoever, and in

addition that various expenses were incurred because the data processing system was adopted. Finally, SM Supply claims that lack of inventory control in 1966 led to the purchase of products which are still on hand and thus are distressed merchandise.

SBC contends, in effect, that SM Supply benefited from the services provided, and that these services were worth the amounts paid for them.[13] SBC points to various facts which indicate that SM Supply was better off with the data processing system. Finally, SBC contends that there is no sufficient basis to assess any damages for distressed merchandise. Whether recovery of the tort damages suffered is in any way dependent on the limitation of liability clauses in the contract will be discussed below.

■ Payments to SBC. It is clear from the evidence that the misrepresentations made by SBC caused SM Supply to contract with SBC for data processing services and to pay a total of $192,551.65 for those services. This amount should be awarded the plaintiffs, less any benefit which SM Supply received from these services.

The Court recognizes, as the plaintiffs claim, that the reports and accounting services SBC furnished SM Supply were of little real benefit to it. The reports were cumbersome and inaccurate to a significant extent. The accounting services were affected by the delay caused by the difficulty in operating the Flexowriter in this system. However, there appear to be certain benefits to SM Supply which should be credited to SBC.

■ Despite the fact that the accounting system provided by SBC did have deficiencies, the Court concludes that these services, while they were not better than those SM Supply had been obtaining earlier, were not significantly

---

13. The evidence shows that SBC lost money in providing these services to SM Supply. SBC calculates that its cost (including an allowance for gross profit of approximately 30 percent) exceeded the amount billed SM Supply by about $115,000. The fact that SBC contracted for these services at a price which cost them money does not negate the disastrous consequences for SM Supply. The Court has not considered whether this "loss" constituted an actual out-of-pocket loss to IBM, the parent corporation.

worse. The benefit of those services to SM Supply would properly be set off against the sum paid to SBC. SM Supply's benefit must be valued at the amount it cost to provide comparable services prior to this transaction with SBC. Formerly, SM Supply produced its own invoices and statements using Burroughs' machines. The cost of providing the accounting services was the amount spent to purchase supplies and to pay clerical help. Normally this amount of money would have to be set off against the $192,000. But SM Supply did not replace that clerical and supply expense with a comparable amount paid SBC. Under the new system the amount paid for clerical cost and supplies increased. The necessary inference, in light of the evidence, is that the old expenses were merely replaced with new, and higher, expenses, and that SM Supply had to give SBC monthly payments of about $4000 in addition. It would be unfair to SM Supply to require that the cost of the prior system be set off against the amount paid SBC, when that cost was in fact still incurred under the SBC system.[14] However, since the Court is aware that the benefits obtained by SM Supply from other reports produced by SBC depended, in part, on information collected through the accounting system, the Court concludes that this system benefited SM Supply in the maximum amount of $15,000, and that sum will be deducted from the $192,000.

The Court does not hesitate to conclude that the weekly sales reports received in 1964 were of no benefit to SM Supply.

Not only were errors present, but that report provided so little information that it was necessary for SM Supply buyers to inspect the stock with the report in hand if it were ever to be useful. The 1965 and 1966 reports were as error-ridden and cumbersome as the previous reports, but the addition of other information—e. g. an on-hand figure—made them of limited use to the plaintiffs. Despite the fact that constant sequencing errors made it impossible for an SM Supply buyer to rely on the accuracy of any one of the items reported, these reports provided about as much useful information as the prior Cardex system. The cost of that system was the time SM Supply's buyers spent in keeping it up to date. The Court concludes that the full amount SM Supply paid for programming and preparation of these reports, $18,698.98,[15] is a reasonable approximation of the prior cost. This amount will be deducted from the total paid SBC.

 With respect to the amounts paid for annual inventory reports,[16] the plaintiffs admit that these reports did provide services which had formerly cost a total of $9,400. The plaintiffs claim that other services provided in connection with these annual inventory reports were worthless. This position can, in part, be sustained because the report submitted not only cumulated movement errors found in the weekly or bi-weekly reports, but also contained random mistakes caused by SBC's programming error. On the other hand, SBC did provide prepunched inventory cards, which were of some value to SM Supply, and pro-

14. The fact that SM Supply scrapped an adequate manual accounting system on the basis of the false representation by SBC that automated accounting was necessary if SM Supply were ever to obtain an inventory control report weighed heavily with the Court in adopting this means of calculating the benefit SM Supply received from SBC's system.

15. The 1965 reports were furnished pursuant to contracts SM 252–4713 (Plaintiffs' Exhibit 11) and SJ 252–4714 (Plaintiffs' Exhibit 12) at a total cost of $9,953.23. SM Supply paid $8,745.75 on contracts

SM 252–5312 (Plaintiffs' Exhibit 14) and SJ 252–5294 (Plaintiffs' Exhibit 15) for the 1966 reports. The amount unpaid on contract 5312 is the subject of defendant's counterclaim and will be discussed in detail below.

16. These reports were provided pursuant to the following contracts: SJ 252–4061 (Plaintiffs' Exhibit 6), SJ 252–4379 (Plaintiffs' Exhibit 8), SJ 252–4676 (Plaintiffs' Exhibit 9), SJ 252–4688 (Plaintiffs' Exhibit 10), SJ 252–5289 (Plaintiffs' Exhibit 13).

vided certain reports which appear to have some value. It appears that the obsolescence report produced pursuant to contract SJ 252–4688 (Plaintiffs' Exhibit 10) was of value to SM Supply for tax purposes. Therefore, an additional amount of $5,399 should be deducted from the total of $192,000 paid SBC. This sum represents the total billed for the obsolescence report, plus the major portion of the sum that SBC billed SM Supply before the end of each year in partial satisfaction of the annual inventory reports.[17] There is no evidence to support the conclusion that the inventory reports were of any more value than plaintiffs have already indicated, so the set-off with respect to this category of reports should total no more than $14,799.00.

Thus, of the $192,551.65 paid to SBC, a total of $48,497.98, must be deducted representing the benefit SM Supply received. SM Supply may recover $144,053.67 of the amount paid SBC.

■ SM Supply's expenditure of $82,823.93 for leasing Friden Flexowriters and the unpaid obligation to Transport Leasing of $13,203.78 were incurred as a direct result of SM Supply's reliance on SBC's misrepresentations. Likewise, the payment of $10,670.40 for maintenance on these machines was directly caused by SBC's misrepresentations. These sums may be recovered by SM Supply.

■ SM Supply claims that operation of the data processing system required more personnel and supplies than would otherwise have been employed. There is no dispute as to the amount the clerical costs increased during the years

1963–1965. (SM did not claim increased clerical costs in 1966, for during that year an undetermined amount of clerical costs was incurred in the changeover to data processing with Computo Services, Inc.) There is likewise no dispute as to the amount that supply costs increased during the years 1963–1966. The testimony that these increases were caused by implementation of the SBC system is uncontradicted. SM Supply claims as an item of damages the difference between its expenditures in each of those years and base figures representing average expenditures for supplies from 1960–1962 and the clerical cost for 1962, with a five percent allowance made each year for the normal increase in wages and prices. The Court concludes that these damages did occur as the proximate result of SBC's misrepresentations and awards the amounts of $24,135.43 for increase in clerical costs and $37,921.60 for increase in cost of supplies.[18]

■ SM Supply claims the salaries of Mr. Droog and the junior Mr. Butler as an item of damages, to the extent their activity involved supervision of the data processing system. The Court agrees that their services were effectively lost to SM Supply during the time they supervised a system which was of little benefit to the company, and that this loss resulted from SBC's misrepresentations.

Although there is no testimony contrary to the plaintiffs' representation that the junior Mr. Butler spent full time in supervision of this system, the Court is not satisfied that the salary of the son of a senior partner in the business who was himself an owner of the

---

17. On the three annual inventory contracts, SBC billed a total of $5,811.12 before the end of the year, and the remainder of $13,807.86 at the time the inventory report was delivered. To the extent that SBC produced cards for "shell" items or "phony" items, SM Supply received no benefit. On the basis of the final count of all items in the file, and the number of them which were phony or shell items, a reduction from $5800 to $5000 seems appropriate.

18. It would be unfair to SM Supply to calculate the increased amount as SBC suggests, by taking five percent off the increased 1963 costs rather than by adding five percent to the 1962 cost. The extra expenditures required in 1963 for additional supplies and extra clerical help reflect 1963 price and wage levels. Thus, SM Supply's means of calculating these costs properly reflects all the additional expenses incurred.

business should be included in full as an item of damages, even if the bulk of his time may have been spent on the computer operation. His very presence on the premises must have been of benefit to the plaintiffs with respect to the business in general. The amount claimed each year with respect to the junior Mr. Butler must initially be reduced by 25% to account for this benefit to the company. After this deduction is made, SM Supply's total claim for executive salaries as an item of damages is $50,500. Since it has been determined above that SM Supply benefited in the amount of $48,000 of the total $192,000 paid SBC, the Court concludes that 25% of this supervision resulted in a benefit to SM Supply. The total claimed by SM Supply must be reduced to $37,875.

The final item of damages claimed by SM Supply is an alleged loss of $181,000 because goods purchased in 1966, when inventory control was not possible, have become obsolete and are now distressed merchandise. SM Supply claims that excessive purchases were made in 1966 because of a lack of inventory control at that time.

The junior Mr. Butler testified at length at the trial regarding the amount of obsolete inventory. According to a sampling he made shortly before and during the trial of the stock on hand at the SM Supply store in Mankato, he calculated that a total of $363,168 worth of goods purchased in 1966 was then on the shelves of the SM Supply stores. He testified that in his judgment SM Supply would receive at best fifty percent of this amount for these goods. Thus, the loss claimed was about $181,500.

The defendant moved to strike Mr. Butler's testimony for failure of proof. The Court recognizes that the sampling procedures followed were open to criticism, but concludes that the plaintiffs have established that a substantial amount of excess inventory purchased in 1966 is still on hand. Allowing for a wide margin of error in the plaintiffs' sampling techniques, the Court will re-

duce the sum the junior Mr. Butler reached by 25% to $136,188.

Once the amount of obsolete inventory is determined, the Court must determine what portion of SM Supply's loss is properly attributed to the false representations made by SBC. It is possible that some of this inventory would be obsolete regardless of the inventory control system used. Neither party has produced any evidence to show what this amount would be. Nevertheless, the Court is satisfied that SM Supply did incur substantial inventory losses in 1966 because of its action in reliance on SBC's representations that the data processing scheme developed for SM Supply was so designed that effective inventory control reports could be produced. Because of the indicated uncertainties regarding this item of damages, the amount to be awarded SM Supply will be one-half of the loss claimed, as adjusted above, or $68,094.

With respect to all of these claimed damages, the defendant argues that SM Supply in fact suffered no loss as a result of its association with SBC. The company's books show that during the years when SBC supplied data processing services, SM Supply suffered losses which were significantly less than those suffered in the years immediately preceding and immediately following. (SM Supply did not show a profit from 1962 to 1967.) SBC points out that net sales increased by $1,000,000; that general expenses, expressed as a percent of net sales, declined; that the rate of increase of inventory slackened. From these facts, SBC deduces that SM Supply suffered no loss as a result of its association with SBC and that increased costs should be considered a natural result of increased sales.

The Court rejects both arguments. It may be that some indicia support SBC's contention that SM Supply was doing better. It is possible that the increase in sales during these years and the decrease in losses were in some way related to SBC's services, but this is speculation. The essential figure in SBC's calculations is the increase in gross sales, and

there is not the slightest evidence in the record to support the conclusion that this increase was caused by SM Supply's use of SBC's services. There is in fact evidence that misbillings, duplications, and errors caused a loss of business to SM Supply.

SBC's association of increased costs (general expenses) with increased sales is not persuasive either. A comparison of general expenses with net sales from the years 1959 to 1967 shows that there is no necessary relationship between these two figures.

The evidence shows that SM Supply did not improve its situation as a result of the SBC system. Inventory control never was achieved during the years SBC and SM Supply did business. At no time during those years did the inventory turnover rate, a main concern of SM Supply, exceed the rate attained in either 1960 (3.71 times) or 1961 (3.27 times). Total inventory, expressed as a percent of sales, never was as low as it was in 1960 (21.93%) or 1961 (24.21%). Yet SM Supply expended large amounts of money during those years on the basis of SBC's representations that it was providing a system which was capable of providing the information necessary for inventory control.

### The Duty to Mitigate

As a general rule, "a party defrauded cannot, after discovery of the fraud, increase his damages by continuing to expend money on the property retained and recover for such expenditures * * *." Perkins v. Meyerton, 190 Minn. 542, 545, 251 N.W. 559, 560 (1934). In this case SM Supply seeks to recover every penny it spent from 1963 through January, 1967. The plaintiffs contend that their duty to mitigate is satisfied by reducing its recovery by $4500, the amount it could have realized by selling the Flexowriters in 1967. SBC contends that if there were any misrepresentations, SM Supply discovered them by the end of 1964, and should not be able to claim as damages the money spent

on the data processing system in 1965 and 1966.

Of course, as the Minnesota Supreme Court indicated in *Perkins,* the general rule is not without limitations. In that case, the Court recognized that a party might continue to accrue damages after learning of the fraud, while he sought a buyer for an unprofitable business. 190 Minn. at 545–546, 251 N.W. at 560–561. Similarly, in a more recent case, the State Supreme Court held that a salesman, to whom a fraudulent representation had been made regarding the commissions earned in a particular territory, could recover damages for the entire sixteen-month period in which he attempted to develop that area, even though he learned early in that period that the commissions were not what they had been represented to be. Davis v. Re-Trac Mfg. Corp., 276 Minn. 116, 149 N.W.2d 37 (1967).

The present case must be considered in light of the general rule and the exceptions to it created by the Minnesota Supreme Court. It may be that by the end of 1964, Mr. Droog and Mr. Charles C. Butler were aware of the fact that the system permitted a significant number of errors to appear, that it did not permit management by exception, that the Friden Flexowriter was a more costly and less efficient means of input production than had been anticipated. But it is by no means clear that at that point these men knew that the potentiality for error could never be removed from an operation involving hand keying a 27–digit control field, and it is by no means clear that these men knew that the SBC system was so designed that an adequate and accurate inventory control report could never be produced. Throughout 1964 and 1965 SM Supply was told by SBC that if SM Supply cleared up its errors, if SM Supply properly used the reports supplied, and if SM Supply adopted further refinements in the reporting system, then a useful service would result. Under these circumstances SM Supply should not now

suffer because it persevered in an attempt to make SBC's product worthwhile.

Furthermore, the representations made by SBC were not ones which the ordinary laymen eventually could easily determine to be true or false. SBC presented to SM Supply new techniques involving a new technology and a new language. This system was represented to have the potential for great benefit to those who used it. It was to permit the managers of this business to retrieve and compare information about their business with a degree of accuracy and at a speed which was unheard of before the computer was developed. But this system also had a potential for great harm to those who adopted it, when the system was improperly designed. This businessman, who decided to automate his accounts receivable and attempted by that to obtain the information necessary for inventory control, took a step down a path from which there was no turning back without great cost. He abandoned his previous accounting system. He discarded his old method of inventory control. His whole business was wrapped around a spool of magnetic tape which was not in his possession and was not even his property. To the extent that the information on that spool was inaccurate, he had no other means to retrieve it or correct it. When the information on that spool was not presented to him in a concise and coherent fashion, he had no means by which the required management decisions could be made.

SM Supply Company started down the data processing path in 1963. By the end of 1964, when SBC contends that any possible misrepresentations must have been discovered, the firm had already spent $82,000 in payments to SBC and Transport Leasing alone. At that time, when the second generation inventory control report was about to be implemented, SM Supply could hardly back away. The sizable investment already made must have been a compelling factor in the decision to continue with SBC. Furthermore, this second generation report was to resemble the report received at the Chevrolet dealership under the AID system. At that time it appeared that inventory control was just around the corner.

With the implementation of the second generation report in early 1965, the junior Mr. Butler testified that for the first time it was possible to see "light at the end of the tunnel." SM Supply, hoping to reap the benefits of its prior investment of time and money, stayed with that system in 1965. Although the system continued to be unworkable, SM Supply decided at the end of that year, on the basis of further representations by SBC, to obtain another "improved" report which appeared to offer all that they wanted. By the end of 1965, when SM Supply looked forward to delivery of the first report which was to provide a fourteen-month history, SM Supply had invested almost $275,000 in this data processing system. In light of SBC's continuing representations that it was the SM Supply workers, not SBC's system, that were causing the problems, SM Supply cannot be faulted for failing at that point to recognize that the system itself was unworkable, to cancel the contracts, and to acknowledge that the money spent had been wasted. This is especially true because Mr. Droog and the junior Mr. Butler had burned their bridges behind them by abandoning their old record systems and placing all of their information in the hands of SBC, in reliance on SBC's representations.

There is another reason why SM Supply could not lightly take the action of severing connections with SBC, either at the end of 1964 or 1965. At both times a new, improved report was anticipated. If SM Supply had sued, the likely answer by SBC would have been that the system would have met all representations made by SBC, if only SM Supply had persevered.

By mid-1966, after the survey conducted by AKOW, SM Supply representatives must clearly have understood that the capabilities of the SBC System had

**138**

been grossly overstated. It would be possible to argue that all payments made after that time cannot be recovered in this action. But this facile application of the traditional rule ignores again the reality of the nightmarish situation in which SM Supply then was. For six months SM Supply buyers had had nothing which could guide them in their purchasing. There is no evidence that the two interim reports showing total movement were of any help to the buyers.

Four years before, when SBC personnel first surveyed the SM Supply operation, both Mr. Sylvester, the Minneapolis sales manager for SBC, and Mr. Joern, an SBC employee, observed that one criterion for determining slow moving items in the SM Supply inventory was the level of dust on the shelves. In 1966, after the system had been in operation for three years and after hundreds of pages of reports had been turned out by SBC, at an expense to SM Supply of approximately $300,000, SM Supply still had no more reliable guide to the obsolescence of its inventory than the level of dust upon the merchandise.

Throughout the first seven months of 1966, SM Supply buyers waited for delivery of the first of the "third generation" inventory control reports. It was hoped by SM Supply's management that this report would finally help them to control a runaway inventory.

Although these third generation inventory control reports did not live up to the representations as to their usefulness made by SBC, the Court has already concluded that they did have just about as much utility as the Cardex system previously used. Therefore, the amount actually paid by SM Supply is here held to have been properly earned by SBC. That amount has already been set off against SM Supply's recovery.

■■ The duty to mitigate, therefore, arises only with respect to the sum of $5,140.31 for third generation inventory control reports delivered to SM Supply after September, 1966, and not paid for. If SM Supply examined these

reports and found them wanting, its proper course of action was to cancel the contract (SM 252–5312), not to accept them without payment. The Court holds that as of October and November, 1966, SM Supply had a duty to mitigate damages by ordering SBC to cease production of the reports. Insofar as the SBC counterclaim seeks recovery for these unpaid bills, it will be granted.

The accounting services present another problem. During the final months of 1966, SM Supply had no other means of providing for accounting services than through SBC. SM Supply intended to continue to try automated data processing with a new service bureau. It was not unreasonable to continue receiving invoicing and billing services from SBC up to the time the changeover was made. Certainly SM should not be required to change over to a manual system for a few months before resuming an automated system. It is possible that the damages suffered would have been greater, had SM Supply, for a short six-month period, adopted a manual accounting system. Furthermore, the delay in the changeover to Computo Services, Inc. resulted at least in part from the difficulty that new firm had in "cleaning out" SBC's master tape of various shell or phony items. SM Supply had no duty to mitigate damages by discontinuing these accounting services at any time in 1966. (SBC's counterclaim for unpaid accounting services, as contrasted with its claim that SM Supply must mitigate damages, is discussed in detail at a later point.)

Interest as Damages

■■ SM Supply Company includes in its claim for relief interest on the amounts paid SBC and Transport Leasing from the date of the payments, and interest on the amount spent for increased clerical cost, increased supplies, and the salaries for Mr. Droog and the junior Mr. Butler, from the end of each year. Interest on the amount paid SBC, to the extent it was allowed as damages, is recoverable, calculated from the date

of each payment. Brody v. Foster, 134 Minn. 91, 158 N.W. 824, L.R.A.1916F, 780 (1916); Jones v. Burgess, 124 Minn. 265, 144 N.W. 954 (1914). Since certain other damages awarded involve sums which can be definitely ascertained, interest on those sums should also be allowed. See Oliver-Electrical Mfg. Co. v. I. O. Teigen Constr. Co., 183 F.Supp. 768 (D.Minn.1960); 37 C.J.S. Fraud § 141 (1943). Such an award is consistent with the modern trend in tort law of allowing full compensation for the injury sustained. 25 C.J.S. Damages § 53 (1966). The amount of interest, where it is alllowed, is detailed in the schedule of damages below.

### Other Causes of Action

■ In its multipronged effort to succeed in this case, SM Supply has proceeded on the theories of recission, breach of implied warranty, reformation, and breach of contract, in addition to the misrepresentation claim already discussed. Since this latter claim constitutes an affirmation of the contract, recission obviously is not available. L'Evesque v. Rognrud, 254 Minn. 55, 93 N.W.2d 672 (1958). Furthermore, recission would not be an appropriate remedy in this case. See Cut Price Super Markets v. Kingpin Foods, Inc., 256 Minn. 339, 98 N.W.2d 257 (1959).

■ The claim based on implied warranty cannot prevail because of the express negation of such warranties in the contracts:

SBC makes no warranties, expressed or implied, other than the express warranties contained in this agreement.

See McPeak v. Boker, 236 Minn. 420, 53 N.W.2d 130 (1952); cf. Uniform Commercial Code § 2–316, M.S.A. § 336.-2–316 (1966).

■ Reformation also is unavailable in this case. The plaintiffs seek to have the Court reform the contract to include an express agreement that SBC would provide SM Supply "inventory control." Initially it should be noted that such reformation would raise many problems. What is meant by "inventory information," "inventory control," and "inventory control reports" was in dispute at the trial. But these problems need not be met, for SM Supply has failed to prove with the requisite clear and convincing evidence, see Hockemeyer v. Pooler, 268 Minn. 551, 566, 130 N.W.2d 367, 378 (1964), that there was in fact a valid prior agreement to that effect, and that this agreement was not incorporated in the contract because of mutual mistake or mistake by SM Supply coupled with fraud by SBC. See Aldrich v. Wilson, 265 Minn. 150, 157, 120 N.W. 2d 849, 854 (1963).[19] The Court, of course, has found that SBC made certain misrepresentations regarding this system, and damages have been awarded on that theory. But the fact that representations regarding this system were made by SBC does not, without more, establish that there was any prior valid agreement between SBC and SM Supply in accordance with which the written contracts should be reformed.

■ Finally, the plaintiffs proceed on a theory of breach of contract. The recovery in tort does not preclude a further recovery on a contract theory. An action for fraud or misrepresentation proceeds on the theory that the plaintiffs affirm the contract. See L'Evesque v. Rognrud, 254 Minn. 55, 93 N.W.2d 672 (1958). If the defendant has failed to perform obligations assumed in a contract induced by fraud, the plaintiffs have suffered two distinct injuries. If they do not rescind, but rather affirm the contract, they have two causes of action—one in tort for fraud and the other in contract for

19. The contracts provide that New York law governs. Whether reformation is governed by New York law or Minnesota law need not be decided, for the same rule of law is followed in both states. Compare the cases cited in the text with Amend v. Hurley, 293 N.Y. 587, 59 N.E. 2d 416 (1944); Isaacs v. Schmuck, 245 N.Y. 77, 156 N.E. 621 (1927); Eastern Air Lines, Inc. v. Trans-Caribbean Airways, Inc., 29 A.D.2d 379, 288 N.Y.S.2d 317 (1968).

breach of the agreement. See Morgan v. Inter-Continental Trading Corp., 360 F.2d 853, 855 (7th Cir. 1966); Bankers Trust Co. v. Pacific Employers Ins. Co., 282 F.2d 106, 110–111 (9th Cir. 1960) cert. denied, 368 U.S. 822, 82 S.Ct. 41, 7 L.Ed.2d 27 (1961); Falls Sand and Gravel Co. v. Western Concrete, Inc., 270 F.Supp. 495 (D.Mont.1967); France and Canada S. S. Corp. v. Berwind-White Coal Mining Co., 229 N.Y. 89, 127 N.E. 893, 10 A.L.R. 752 (1920). While the plaintiffs may proceed on both causes of action they cannot recover damages in excess of the actual injury sustained. France and Canada S. S. Corp. v. Berwind-White Coal Mining Co., supra, at 95, 127 N.E. at 894; McKee v. Martin, 119 Vt. 177, 183, 122 A.2d 868, 871 (1956).

In contrast to the broad representations made by SBC, the contracts signed by the parties merely provide that SBC will perform certain designated services—either programming or production of reports. The contracts uniformly provide that SBC will take due care in such work. They also expressly disclaim any other warranties or representations by SBC.

SM Supply asks that these contracts be construed to provide that SBC promises to provide SM Supply inventory control. Such a broad construction of the contracts—whether considered singly or as a whole—is not proper. Each contract designates the services to be supplied. In light of this explicit designation and of the other clauses in the contracts outlined above, SM Supply's claim must be rejected.

SM Supply properly indicates three areas in which the contracts as written were breached. First, there were a number of relatively minor errors in invoicing and billing for which SBC was responsible. SM Supply has failed to prove with the requisite certainty any resulting damages, in addition to those already incorporated in the tort award. While it was proven that some customer dissatisfaction resulted from these errors, there is not enough evidence in the record to sustain any award for loss of profit, loss of customers, or loss of goodwill or business reputation. (Nor were such items considered in making the tort award.)

SM Supply is also unable to recover any further damages as a result of the other two breaches of the contracts— SBC's programming error which produced inaccuracies in the quarterly movement report and the late delivery of the 1966 report. Damages have already been assessed for the programming error. With respect to the 1966 report, the plaintiffs seek to recover both for the delay in receiving the report and for the excess inventory which was purchased because the reports were not provided. But SM Supply has received a $5,187.32 reduction in the price for the delay in and incompleteness of this report. An award has already been made for damages resulting from the excess inventory acquired in 1966. Therefore, no further award of damages for breach of contract would be appropriate.

Each of the contracts involved here recites that New York law is to govern. This choice of law provision is valid under Minnesota law. See Combined Ins. Co. of Am. v. Bode, 247 Minn. 458, 77 N.W.2d 533 (1956). The contracts contain limitation of liability clauses which would limit the damages recoverable for breach of contract. Such clauses are valid with respect to the contract claim or with respect to a negligence action. See Farris Engineering Corp. v. Service Bureau Corp., 406 F.2d 519 (3d. Cir., 1969). But these provisions of the contracts do not limit the recovery for fraud or misrepresentation. See Channel Master Corp. v. Aluminum Limited Sales, Inc., 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); Lyman v. Romboli, 293 Mass. 373, 199 N.E. 916 (1936).

### Defendant's Counterclaim

SBC seeks to recover $24,041.25 still owing on various contracts with SM Supply. Three types of claims are involved. First, the defendant seeks the

$5,140.31 owing on contract SM 252–5312 for production of the third generation inventory control reports. The Court has already indicated that this portion of the counterclaim will be granted.

The defendant also seeks to recover $15,462.71 unpaid on contract SM 252–3389, the basic contract pursuant to which the accounting and billing services were rendered. The Court has already ruled that SM Supply had no duty to mitigate damages by cancelling these services. Therefore, if these bills had been paid, SM Supply could have recovered the greater portion of that amount in damages. The Court will thus deny this claim, except insofar as SM Supply would not have been able to recover it as an item of damages. Of the $138,907.98 which was paid on this contract, the Court ruled that SM Supply could recover all but $15,000, or 11% of the total. The Court will deny this portion of the counterclaim except for a similar 11% of the $15,462.71 claimed, or $1,700.00.

The third portion of the counterclaim is for sums owing for the cost of the cyclical inventory program and for the cost incurred in providing CSI the tapes necessary to set up a new system. If these sums had been paid, SM Supply would now be able to recover them. This portion of the counterclaim is denied.

The defendant can thus recover in its counterclaim the sums of $5,140.31 and $1,700.00, or a total of $6,840.31, with interest from the date on which demand for payment was made, February 17, 1967.

### Schedule of Damages

All of the items of damages discussed above are set forth below, together with any interest which is allowed. As has been indicated, most of these sums may be calculated precisely; the award for distressed merchandise from purchases made in 1966 is an exception. That amount is, of necessity, an estimate. With respect to this portion of the award, the Court is mindful of the standard set forth by the Supreme Court in Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S. Ct. 400, 71 L.Ed. 684 (1927):

> Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate. * * * Furthermore, a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible. 273 U.S. at 379, 47 S.Ct. at 405.

This standard, which was recently approved in Arthur Murray, Inc. v. Reserve Plan, Inc., 406 F.2d 1138 (8th Cir., filed Feb. 5, 1969), and Dean Foods Co. v. Albrecht Dairy Co., 396 F.2d 652, 660–661 (8th Cir. 1968), must be followed here, because the very lack of accurate records and an adequate method to ascertain that portion of SM Supply's inventory loss which is attributable to SBC is a result of SM Supply's reliance on SBC's misrepresentations and SM Supply's adoption of SBC's error prone data processing system.

Interest on the amounts paid to Transport Leasing and for Friden maintenance has been calculated from the date of each payment. See Plaintiffs' Exhibit 81. Interest on the increased cost of supplies and clerical help, and on the executive salaries, has been calculated from the end of each year involved. See Plaintiffs' Exhibit 81–A.

Interest on the award of $144,053.67 of the total of $192,551.65 paid to SBC is calculated in essentially the same manner as on the amounts paid to Transport Leasing. In connection with their claim at trial for the entire $192,000, the plaintiffs calculated the interest on the full amount of each of 36 payments to SBC from the date of the payment to December 31, 1966. This sum was $17,931.54. See Plaintiffs' Exhibit 81. Since the

amount actually awarded was only slightly less than 75% of the total amount actually paid SBC, this Court has not recalculated interest on the precise percentage of each of these payments, but has taken 75% of that sum of $17,931.54, or $13,448.66, as the amount of interest to be awarded as of December 31, 1966.

From that date, interest has been calculated on the sum actually awarded.

Interest on SBC's counterclaim has been calculated from the date payment was demanded.

No interest is allowed on the sums owing to Transport Leasing or on the recovery for inventory loss from 1966.

## SM SUPPLY'S RECOVERY

| | |
|---|---:|
| Portion of amount paid to SBC | $144,053.67 |
| (pages 132 to 134, supra) | |
| Interest to March 31, 1969 | 32,866.30 |
| Amount paid to Transport Leasing | 82,823.93 |
| (page 134, supra) | |
| Interest to March 31, 1969 | 14,098.86 |
| Amount owing to Transport Leasing | 13,203.78 |
| (page 134, supra) | |
| Amount paid for Friden maintenance | 10,670.40 |
| (page 134, supra) | |
| Interest to March 31, 1969 | 2,611.26 |
| Increased clerical costs | 24,135.43 |
| (page 134, supra) | |
| Interest to March 31, 1969 | 6,322.99 |
| Increased cost of supplies | 37,921.60 |
| (page 134, supra) | |
| Interest to March 31, 1969 | 9,557.85 |
| Executive salaries | 37,875.00 |
| (pages 134 to 135, supra) | |
| Interest to March 31, 1969 | 8,784.45 |
| Inventory loss from 1966 | 68,094.00 |
| (page 135, supra) | |
| **Total** | **$493,019.52** |

## SBC'S COUNTERCLAIM AND SALVAGE OF FLEXOWRITERS

| | |
|---|---:|
| Counterclaim recovery | $ 6,840.31 |
| (pages 140 to 141, supra) | |
| Interest to March 31, 1969 | 867.88 |
| Salvage value of Flexowriters | 4,500.00 |
| (page 136, supra) | |
| | $ 12,208.19 |

## NET RECOVERY

| | |
|---|---:|
| SM Supply's Recovery | $493,019.52 |
| Counterclaim and salvage value | −12,208.19 |
| | $480,811.33 |

Let judgment be entered accordingly.